Eugene R. BAUT and Harry S. Baut,
Plaintiffs,

v.

**PETHICK CONSTRUCTION COMPANY,**
a corporation, Defendant.

Dale CARLE, Executor of the Estate of
Ira Carle, deceased, who, during his lifetime, traded and did business as Paddock Glass Company, Defendant, Third-Party Plaintiff,

v.

Ettore J. LIPPI, Third-Party Defendant.

Civ. No. 8169.

United States District Court
M. D. Pennsylvania.

Dec. 21, 1966.

Edward D. Morgan, Boyle, Davis & Morgan, Wilkes-Barre, Pa., for plaintiffs. Harvey B. Jacobson, Washington, D. C., of counsel.

Hourigan, Kluger & Spohrer, Wilkes-Barre, Pa., for defendant, Pethick Const. Co.

Moore, Rowlands, Harris, Cappellini & Berman, Wilkes-Barre, Pa., for defendant, Paddock Glass Co.

Joseph F. Flanagan, Reynolds, Reynolds & Doran, Wilkes-Barre, Pa., for third party defendant, Ettore J. Lippi.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

SHERIDAN, Chief Judge.

This is an action for patent infringement, unfair competition, and wrongful appropriation of property rights in connection with a stained glass window, which was installed in the Forty Fort Presbyterian Church, Forty Fort, Pennsylvania.

Plaintiffs, Eugene R. Baut and Harry S. Baut, are the holders of United States Letters Patent 3,064,380 for an invention which generally relates to a type of stained glass construction called "art glass" panel construction, and more particularly, to a metal art glass panel. Defendant, Pethick Construction Company (Pethick), was the general contractor in the construction of the church. Defendant, Dale Carle, is the executor of the estate of Ira Carle, deceased, who, during his lifetime, did business as Paddock Glass Company (Paddock), which was the sub-contractor for the stained glass window in the church. Third party defendant, Ettore J. Lippi (Lippi), was the architect who drew the plans and specifications on which the construction contract was awarded.

THE INVENTION: Conventional stained glass windows are employed for producing an artistic and decorative effect when light shines through the stained glass; without light, however, the windows do not produce the design effect that is produced when light shines through. The primary object of the art glass panel is to give color designs, like conventional stained glass, when light shines through it, but also to give surface designs when light is bouncing off the window rather than passing through it. The surface design is the result of light reflected from metal surfaces such as aluminum, bronze or brass. Another object of the invention is to provide an art glass panel which is a structurally stable unit with the glass expanding and contracting independently of the metal sheets. This structural stability permits manufacture of panels up to 48 square feet in one piece whereas conventional stained glass must be made in considerably lesser sizes.

The art glass panel, which is generally inexpensive to manufacture, is simple in construction. It includes two panels of metal, such as aluminum, out of which are cut a plurality of openings in a particular pattern to achieve a certain design. The openings in the panels are in registry with each other and are of the same shape or size so that an opening is produced when the panels are arranged in superimposed relation. Sandwiched between the metal sheets is a plurality of pieces of glass having a shape generally of the same configuration as the shapes

of the openings, but having individually a slightly larger area so that the edges of the glass extend beyond the periphery of the openings. An annular spacer is used on the peripheral edges of metal panels and intermediate spacers are used between the panels for retaining the panels in spaced parallel relation. The panels are fastened to the spacers by means of an epoxy glue and the glass is secured to the metal panels by means of an epoxy resin which also produces a seal between both surfaces of the glass pieces and the metal sheets.

The art glass panel can be used alone, or incorporated as a part of conventional stained glass windows to vary or enlarge upon designs and patterns. Such incorporation can be achieved (1) by assembling the surrounding conventional stained glass so that it would be overlapped in a channel, formed by indenting the peripheral spacer along the circumferential edge of the panel, or (2) by using high hart lead cames along the periphery of the surrounding conventional stained glass which would overlap the circumferential edges of the panel.

BACKGROUND: Plaintiffs began development of the art glass panel in the latter part of 1957 or the early part of 1958. The first art glass panel was sold by them in 1959 and installed in 1960. Since that time they have continuously sold art glass panels. On April 19, 1960, they filed an application for a patent. In the late fall of 1961, while the application was pending, William Goodman, a member of the Building Committee of the church's Board of Trustees, stopped at plaintiffs' place of business and informed them that the congregation intended to build an addition to existing church facilities and that he was seeking ideas as to the way the addition, which was to front on a busy thoroughfare, could be decorated with a fine stained glass window. In a general way plaintiffs advised Goodman what could be done. The use of either art glass panels or conventional stained glass was discussed. The church then engaged Lippi as its architect.

In the spring of 1962, Harold Jones, a registered architect from Lippi's firm, and a supervisor of all Lippi's work, stopped by plaintiffs' place of businesss with a rough sketch of what Lippi had considered for the church and window. The sketch did not include a design of the window but showed only an opening in the structural framework in which the window would be set. The window was to extend, and was later constructed to extend, over almost the entire front of the church. After lengthy discussion, during which plaintiffs' prior discussion with Goodman was disclosed, Jones requested plaintiffs to prepare a design for the window. Jones made no suggestions with respect to design. At first, plaintiffs refused because it was not their policy to incur substantial costs for custom designs on jobs which they did not have and might not get. Jones, however, urged the preparation of a design because he had to have something to show the church board. Plaintiffs finally agreed to prepare and submit a design because they concluded they would receive the award on any resulting specifications for a window which incorporated a requirement for their custom design and proprietary art glass panels. At this time also, plaintiffs told Jones that a patent for the art glass panels had been applied for and Jones relayed this information to Lippi.

John Love, an artist employed by plaintiffs, prepared pencil sketches of a design which were seen by Mr. Goodman who considered them to be excellent. Transparent design sketches were then made and, together with a set of guide specifications, were forwarded to Mr. Jones in April 1962. The designs were clearly marked with plaintiff's name. At this time, plaintiffs also submitted preliminary cost studies for a conventional stained glass window, and a combination of a conventional stained glass window incorporating art glass panels.

Lippi, and Jones under Lippi's supervision, prepared drawings and specifications for the construction of the church which were sent to selected contractors

for solicitation of bids. The glass and glazing part of the specifications called for, among other things, the stained glass window for the front of the church. Bids for the window were invited on two alternate bases: (1) a "custom design, composed of conventional leaded glass sections with art glass overlayments to create surface design effect," [1] and (2) "conventional stained glass in an over-all abstract design." In either case, the contractor was required to submit a design of the window to the architect for approval before fabrication and installation. The alternate method of soliciting bids was in accordance with plaintiffs' preliminary proposal, and the specifications for the art glass window were substantially in accordance with plaintiffs' proposed specifications although they did not follow plaintiffs' proposal word for word.

Prior to the day set for the submission of the bid proposals, Benjamin Kasmark, the sole designer and artist employed by Paddock and in charge of Paddock's stained glass section, went to Lippi's place of business to have the structure and design parts of the specifications interpreted. At this time, Jones showed Kasmark the design submitted by plaintiffs, and Kasmark knew this was plaintiffs' design. Plaintiffs had not given permission to show the design to anyone but the church board. The bids were received by Lippi on June 22, 1962. Pethick's bid, which included the alternate price from Paddock for the window but did not disclose Paddock as the subcontractor, was the low bid, and in July 1962, the general contract was awarded to Pethick. Shortly thereafter, Goodman and Edward Bonham, another member of the board who was also a construction man in the employ of a construction company, visited Lippi's place of business and were shown the Baut design.

In late August or September, 1962, Pethick entered into an oral subcontract with Paddock. Paddock was instructed to submit a custom design for approval, and afterward, to construct and install a window embodying aluminum panels in accordance with the prime contract requirements. Shortly thereafter, plaintiffs called Pethick to inquire about the award of the subcontract for the stained glass window and spoke with Charles Johns, Secretary-Treasurer of Pethick. Johns informed plaintiffs that another firm was awarded the subcontract, there being a difference of about $5,000 between plaintiffs' bid and the bid of the other firm. Plaintiffs inquired whether the award to the other firm was for the custom design with conventional stained glass incorporating art glass overlayments or the conventional stained glass in abstract design. When informed it was for the custom design with art glass panel overlayments, plaintiffs told him that a patent application for the art glass panels had been filed, and that the architect's specifications were based on plaintiffs' preliminary proposal to Lippi, which included the requirements for an

---

1. The entire specifications for the custom design window were:

"Furnish and install stained glass window on front of church as indicated on the drawings and specified herein.

"Stained glass window shall be custom design, composed of conventional leaded glass sections with art glass overlayments to create surface design effect.

"Stained glass window shall be designed, executed and installed in accordance with the following specifications:

"a. All glasses used shall be mouth blown antique glasses, best quality.

"b. All lead cames shall be made from freshly mined pig lead as manufactured by the National Lead Company.

"c. Stained glass shall be cemented on both sides to provide stiffness and insure water-tightness.

"d. Metal Art Glass panels shall be anodized aluminum and coated with one coat of clear epoxy resin. Aluminum shall be fastened to stained glass with carvable type epoxy resin.

"e. All seals shall be air-tight.

"f. All stained glass and metal art panels shall be set in glazing compound as manufactured by the Dicks-Armstrong-Pontius Company, or approved equal.

"Stained glass window Contractor shall be required to submit design of window to the Architect for approval before fabrication and installation."

art glass panel. Until this time, Pethick was not aware of the pending patent application, and Jones had not told Pethick of his preliminary conversations with plaintiffs in which Jones learned that a patent had been applied for. Pethick nevertheless directed Paddock to proceed.

At about this time, the fall of 1962, two or three members of the Building Committee of the church, including Bonham, visited plaintiffs' place of business to obtain more information on art glass panels. Plaintiffs were casting an art panel for a convent in New Jersey, and permitted them to see the entire process. The committee also obtained a sample panel from plaintiffs.

During the fall of 1962, Lippi showed plaintiffs' custom design to the church Building Committee, and it was also turned over by Lippi to Kasmark for a day or two. Kasmark knew the design was prepared by plaintiffs. Kasmark then prepared his design.

On November 20, 1962, plaintiffs' patent application was approved and a patent was issued citing eleven United States patents and one foreign patent as references.

In December 1962, or January 1963, the church's Board of Trustees, Lippi represented by Jones, Paddock represented by Kasmark, and Pethick represented by Johns, met for the purpose of finalizing a design. Kasmark submitted the Paddock design and it was compared with the plaintiffs' design. Pethick learned at this meeting that plaintiffs had prepared the design but did not then learn whether or not it was a custom design. The Paddock design was basically accepted, with certain changes suggested. Kasmark was shown the sample panel constructed by plaintiffs, and the Building Committee, especially Bonham, explained to him in detail how the panel was constructed. The committee directed Kasmark to make a panel exactly like it. Kasmark modified the design and constructed a panel and both were approved. Subsequent to this meeting, Pethick learned that the plaintiffs' design, which was compared at the meeting

with the Paddock design, was a custom design.

In March 1963, work was begun on the front window which, at the committee's direction, was to be entirely made of art glass panels constructed in the same way as plaintiffs' art glass panel. On March 18, 1963, plaintiffs' counsel wrote a letter to Pethick with copies to Paddock, Lippi and the church advising that the window infringed the plaintiffs' patent. On the same day, Lippi was requested to furnish a copy of the specifications to counsel. The specifications were furnished. Soon thereafter, Lippi directed Paddock to remove the window because it possibly infringed upon plaintiffs' patent. On April 9, 1963, Paddock advised Lippi that plaintiffs would not license Paddock to complete the window with art glass overlayments and requested permission to furnish a conventional stained glass window in accordance with the alternative bid. Lippi advised that this was unacceptable to the church. Lippi discussed the matter with Paddock and suggested that Paddock build a sample window, in accordance with Lippi's instructions, which could then be examined to determine if the resulting window still infringed upon the patent. On April 11, 1963, Paddock wrote to Pethick which on the same day forwarded Paddock's letter and its own views to Lippi on the interpretation of the specifications. Paddock and Pethick were of the opinion that while an entire window made of art glass panels and using no lead cames, as directed by the committee, would be violative of the patent, such construction was contrary to the specifications which contemplated the use of lead cames. They also pointed out that the artistic custom design indicates that except for certain features such as symbols and designs made of aluminum which were to be incorporated in the window, the remainder of the window panels were almost devoid of aluminum. They proposed, therefore, that they be permitted to install a " 'conventional stained glass window of custom design, with lead cames, on to which a limited design of

aluminum has been affixed in certain positions to create a "surface design".'"[2] They thought that such a window would not infringe the patent. A sample panel was approved by the board. The window was constructed in this manner. Subsequently, a window incorporating art glass panels identical to this one was installed by Paddock in St. Mary's Help of Christians' Church, Pittston, Pennsylvania.

■ THE VALIDITY OF THE PATENT: Defendants did not serve notice of principal order patents to be relied on and did not introduce evidence of any prior patent, publication or reference directed to plaintiffs' patent even though aware of the references relied on by the Patent Office in processing plaintiffs' application, and even though Paddock engaged a lawyer to search the records of the Patent Office. Plaintiffs rely, therefore, on Title 35 U.S.C.A. § 282 which provides in part:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

The presumption of validity is not to be overthrown except by clear and cogent evidence. Radio Corp. of America v. Radio Eng. Lab. Inc., 1934, 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453; Devex Corp. v. General Motors Corp., 7 Cir. 1963, 321 F.2d 234.

■ Both Pethick and Paddock attack the validity of plaintiffs' patent primarily on the basis that the patent should not have issued because the alleged invention would be obvious to those of ordinary skill in the art. This contention is based on 35 U.S.C.A. § 103, which provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

In applying this section, the scope and intent of the prior art are determined, the differences between the prior art and the patent claims are ascertained, and the level of ordinary skill in the art resolved. Against this background, the obviousness of the subject matter is determined. Gould-National Batteries, Inc. v. Gulton Ind., Inc., 3 Cir. 1966, 361 F.2d 912.

The record contains little evidence of the prior art, its differences with the patent claims, and the level of skill in the art. Defendants did not produce any such testimony and the third party defendant produced only one witness whose testimony did not concern the prior art. Information on the prior art, therefore, can be gleaned only from statements made by plaintiffs' witnesses during the trial, and from depositions and exhibits introduced in evidence by plaintiffs.

■ From the information of record, it appears that conventional stained glass windows are made by placing H shaped lead cames along the peripheral edges of a piece of glass, which are also cemented into the cames, and soldering the cames to each other. The design, which either can be random and abstract or can depict a specific picture or scene, is determined largely by the shape of the glass. The obviousness of plaintiffs' glass panel and the prior art is certainly not apparent from the windows themselves. Likewise, the testimony of Kasmark, a man of long experience in this field, and of Dale Carle, an experienced glazier for Paddock, that the window in the church is of conventional construction, does not help defendants. Their testimony clearly shows that the differences were not obvious. Kasmark, who was primarily responsible for the design and construction

---

**2.** Compare this interpretation with actual specifications as set forth in note 1, supra.

of the window, was not sure at the time of the bidding how to construct the art glass panel window called for by the specifications. This prompted him to seek an explanation from Jones. Kasmark testified that even Jones, who wrote the specifications, did not know how to instruct Kasmark on the art glass panels, undoubtedly because Jones merely incorporated plaintiffs' guide specifications into the contract specifications. Kasmark had never seen a conventional stained glass window with metal art glass overlays. He did not know what the specifications meant in calling for one coat of clear epoxy resin. This was the first time Paddock was called upon to use epoxy resin in the construction of a window. No sample panel was constructed until after the meeting at which the details of the art glass panel were explained by Bonham to Kasmark and until after Kasmark had seen plaintiffs' sample panel. Paddock had never installed a stained glass window incorporating two aluminum panels in alignment and space relationship held together by epoxy resin. Kasmark instructed Carle, who worked on the subcontract, on how to make art glass panels. "Where before the disclosure of a patent * * * experts are unable to foresee the solution provided by the patent, an inference of nonobviousness is not without justification." Jones Knitting Corp. v. Morgan, 3 Cir. 1966, 361 F.2d 451.

Defendants point to a statement by Kasmark that Paddock made a window for Temple B'Nai B'rith "long before the patent was talked about," in the same manner as that in the church. The window in Temple B'Nai B'rith was made with "glass as overlayed instead of aluminum" and, therefore, would not achieve the same effect, or structural stability of aluminum art glass panels. Also, the statement is merely conclusional since no details were given.

■ Other matters which indicate nonobviousness are that plaintiffs are enjoying commercial success in the sale of the panels, and Paddock attempted to obtain a license from plaintiffs so that construction could be resumed. Jones Knitting Corp. v. Morgan, supra; 112 U. Pa.L.Rev. 1169 (1964).

■ Defendants argue that the patent is invalid because it lacks novelty in that the structure is composed of a combination of elements which are not new and which plaintiffs did not invent. That the elements are old does not preclude patentability. Assuming that the structure is a patent combination, " 'It is established law that all the elements of a combination may be old * * * [but] if the elements co-acting produce a new and useful result, the combination is patentable.' " Troy Co. v. Products Research Co., 9 Cir. 1964, 339 F.2d 364. Here the new and useful result consists of a surface artistic design when light does not shine through the window, and a structural stability which permits the manufacture of a stained glass panel in a piece much larger than that permitted in the manufacture of conventional stained glass. This constitutes a significant advance over the prior art. Cf. Gould-National Batteries, Inc. v. Gulton Ind., Inc., supra.

■ Defendants have not established invalidity of the patent.

■ THE INFRINGEMENT: Infringement exists when the accused device and the device covered by the patent are substantially identical in structure, mode of operation, and results accomplished. Texsteam Corp. v. Blanchard, 5 Cir. 1962, 352 F.2d 983. Elgen Mfg. Co. v. Ventfabrics, Inc., 7 Cir. 1963, 314 F. 2d 440. "In determining whether an accused device * * * infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out * * *." Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; Dvorsky v. United States, Ct.Cl.1965, 352 F.2d 373. Elgen Mfg. Co. v. Ventfabrics, Inc., supra; McCullough Tool Co. v. Well Surveys, Inc., 10 Cir. 1965, 343 F.2d 381. Whether the defendants' device is within the claim, however, does not depend on the mere ap-

plication of claim phraseology. Elgen Mfg. Co. v. Ventfabrics, Inc., N.D.Ill. 1962, 207 F.Supp. 240, aff'd 7 Cir. 1963, 314 F.2d 440. Patent infringement is not a mere matter of words. Nickerson v. Bearfoot Sole Co., 6 Cir. 1963, 311 F. 2d 858; McCullough Tool Co. v. Well Surveys, Inc., supra.

The patent includes four claims: Numbers 1 through 3 relate to a new and novel structure and claim 4 relates to a method. At the trial plaintiffs limited their allegations of infringement to claim 3.

Claim 3 of plaintiffs' patent, broken down into a preamble and seven lettered elements, is as follows:

"Preamble   an art glass panel construction comprising

"Element A  a first metal panel

"Element B  a second metal panel aligned with said first panel

"Element C  reflective outer surfaces on the panels

"Element D  said panels each having a plurality of openings therein with the openings being in registry

"Element E  a plurality of glass panes disposed between the metal panels in alignment with the openings, each glass pane being slightly larger than the corresponding openings and overlapping the two panels on all sides of the openings

"Element F  spacer means slightly thicker than the glass panes, said spacer means disposed between the panels spacing the panels from each other

"Element G  a bonding material sealing the overlapping portion of each glass pane to both of the panels".

The elements of the accused structure are substantially similar to plaintiffs' claim and fall within the phraseology used in the claim. Each includes a pair of aligned metal panels, with reflective surfaces, having openings in registry with glass disposed between the panels and in alignment with and covering the openings. Each used spacer means between the panels and a bonding material sealed the overlapping portion of the glass to both of the panels.

There are other matters to be considered. Both defendants admit that the structures are the same in the results accomplished. It is also clear that their function is the same in that each operates to give artistic design when light shines through the glass and surface design when light bounces off the metal. Defendants deny that the structure is the same because the result is accomplished in a substantially different way. In effect, they contend that the devices lack substantial similarity, patent phraseology notwithstanding.

Much of their argument goes to the difference in methods of construction such as the use by plaintiffs of poured epoxy and the use by defendants of epoxy applied in the way ordinary putty is applied, and plaintiffs' construction of the panel as a separate unit with subsequent installation in the conventional glass and defendants' construction of the panel piece by piece at the time it is incorporated into the conventional window. Plaintiffs have not tried the case on the basis of their assembly method, included in claim 4 of the patent, but limited the issues to the structure described in claim 3. These differences in method, cited by defendants, are not germane. Hookless Fastener Co. v. G. E. Prentice Mfg. Co., 2 Cir. 1935, 75 F.2d 264. Moreover, even if the differences in assembly methods were germane, they are inconsequential. An infringer cannot avoid infringement by varying the details by which it makes use of the disclosures in the patent. Ekco Products Co. v. Chicago Metallic Mfg. Co., 7 Cir. 1963, 321 F.2d 550. Smith v. Snow, 1935, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721.

More important are the claimed structural differences as they may shed light on the issue of the substantial similarity of the structures and the means by which the same structure or result is achieved. "[A] machine or device which performs the same function or accomplishes the same result by substantially different means, or by a substantially different principle or mode of operation, or in a substantially different way, does not infringe the patented invention." Nickerson v. Bearfoot Sole Co., supra. Under the doctrine of equivalents, however, infringement may exist even though two devices differ in name, shape or form. Complete identity for every purpose and in every respect is not required. McCullough Tool Co. v. Well Surveys, Inc., supra. A component is deemed equivalent if it does the same work in substantially the same way and accomplishes substantially the same result. Sanitary Refrigerator Co. v. Winters, 1929, 280 U.S. 30, 50 S.Ct. 9, 74 L. Ed. 147.

Plaintiffs have pointed to several differences between the structures. All of these differences refer to matters disclosed in elements F and G of plaintiffs' claim. Most of the differences, however, are caused by the substitution by defendants of one element which performs the same function as elements F and G. Defendants use lead cames which serve to hold the panels together, hold the windows in the panel and act as spacer means. That defendants use cames to act as spacer means, as opposed to the annular spacer used by plaintiffs, does not create a substantial difference. The cames do the same work and achieve the same result, and they do it in substantially the same way. Certain of the cames go around the peripheral edges of the metal panels. Some of the lead cames included in the interior of defendants' structure serve no other purpose than to hold the panels in space relationship, the same purpose as plaintiffs' intermediate spacers.

That the peripheral cames also hold the panels together, as opposed to the epoxy glue used by plaintiffs to cement the panels to the spacers and thereby hold the panels together, also is not a substantial difference. The lead cames of themselves do not achieve this bond; rather a regular came is soldered to a high hart came. In effect, defendants are using solder applied on one area as opposed to glue applied by plaintiffs on two areas. The soldered cames accomplish the same result in substantially the same way as the glued spacer in holding the panels together.

Another difference is that cames also hold the glass in place, as opposed to plaintiffs' structure in which the glass is held in place by epoxy resin. Since the cames when wrapped around the glass do not create a seal, defendants also used an epoxy resin to create a seal. On one panel of the defendants' structure in the area of the high hart cames, the epoxy resin is used to bond the glass panes to the metal panel as well as to create a seal. In the interior where a regular came holds the glass, the epoxy resin is applied primarily to create a seal. Epoxy is also used by defendants to fill the openings between the other side of the glass pane and the second metal panel to seal spaces and give the structure a finished appearance. There is no substantial difference in results attained and means used in the two structures. Each uses the epoxy resin as a sealant. Defendants' structure also uses the epoxy resin to some extent to bond the glass to the metal panels, which is the use made of the resin in plaintiffs' structure. While defendants' interior cames also operate to hold the glass in place, in view of the use of epoxy resin, the use of the interior cames for this purpose is unnecessary. Since the interior cames on defendants' structure operate as spacer means, the fact that they also hold the pane does not avoid infringement. Cf. Johns-Manville Corp. v. National Tank Seal Co., 10 Cir. 1931, 49 F.2d 142; McCullough Tool Co. v. Well Surveys, Inc., supra, 343 F.2d at page 402.

Defendants assert that epoxy resin was used merely to meet specifications

but that ordinary putty could have been used, whereas epoxy resin is an essential part of plaintiffs' structure. Defendants point to no testimony or other evidence to support its assertion. Moreover, claim 3 of plaintiffs' patent calls merely for the use of a bonding material which seals the pane to the panels.

Other differences are stressed which are immaterial or insubstantial. Defendants' device is substantially identical to that of plaintiffs in structure, mode of operation and results accomplished. Plaintiffs' patent is infringed.

RESPONSIBILITY FOR INFRINGE-MENT AS BETWEEN DEFEND-ANTS: Pethick argues that while patent infringement can be charged against one who, without authority, uses, manufactures and sells the article,[3] and that while technically it sold the window, the construction was directed and controlled by Lippi and Paddock. Pethick states that it did not do anything and did not have dealings which could implicate it in any of the charges, and, as the general contractor, was merely caught up in the interplay between the prime actors, Lippi, Paddock and the church trustees, from whose decisions Pethick claims it was excluded.

Pethick cites no authority for this argument. Even if these facts were true, it would not be relieved of responsibility. Knowledge and intent are not material to the issue of infringement. Freedman v. Friedman, 4 Cir. 1957, 242 F.2d 364; Kim Bros. v. Hagler, S.D. Calif.1958, 167 F.Supp. 665. A contractor whose subcontractor infringes a patent is equally liable. Jackson v. Nagle, C.C.N.D.Calif.1891, 47 F. 703; Bowers Dredging Co. v. New York Dredging Co., C.C.D.Wash.1896, 77 F. 980. Pethick clearly is one who makes, uses or sells a patented invention within the meaning of 35 U.S.C.A. § 271.

Moreover, Pethick did more than sell the window. At the time of the award of the subcontract, plaintiffs told Pethick

that the art glass panels described in the specifications were the subject of a patent application. After the patent was issued, Pethick was present at a meeting at which a model of plaintiffs' structure was displayed and its construction explained to Kasmark in detail for the purpose of copying it. It was subsequently advised by letter that the structure installed infringed a patent. Finally, it undertook to convince Lippi that Paddock's reinterpretation of the specifications would result in a window which did not infringe, and cited the need for a speedy decision to prevent a delay in job completion beyond April 30, 1963. The resulting window is the subject of the lawsuit.

Paddock, on the other hand, argues that it was merely the agent of Pethick, acting within the scope of its employment, and, therefore, any liability of Paddock should be placed upon Pethick. This argument cannot help Paddock. Even if Paddock were the agent of Pethick, it would not be insulated from liability to plaintiffs. "An agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal. * * *" Restatement 2d, Agency § 343. Also, Pethick neither pleaded nor offered evidence of agency. As far as this record is concerned, Paddock was an independent contractor for whose torts Pethick is not responsible. See Restatement 2d, Agency §§ 220, 250. If, on the other hand, Paddock, by this argument, seeks indemnification or exoneration from Pethick,[4] there are several things wrong with this approach. Paddock did not file a cross claim against Pethick. Rule 13 Fed.R.Civ.P. This in itself might not have been fatal if the defendants had tried the lawsuit so as to include the issue of indemnification. Rule 15(b) Fed.R.Civ.P. Neither Pethick nor Paddock offered any evidence of indemnification. If Paddock desired to raise this issue, it should have done so

---

3.  35 U.S.C.A. § 271.

4.  See Restatement 2d, Agency § 438, Comments a. and b. and § 439, Comment on Clause (c).

as to permit Pethick to meet it with evidence. Thus, just as Pethick's actions subject it to liability, Paddock's actions, in union with those of Pethick, subject Paddock to liability. Paddock must be considered a joint infringer. Jackson v. Nagle, supra.

**APPROPRIATION OF DESIGN:** Plaintiffs have no protection under the copyright laws, and so resort must be had to the common law. Pennsylvania recognizes a common law right in an artistic production. Waring v. WDAS Broadcasting Station, Inc., 1937, 327 Pa. 433, 194 A. 631. "Under the common law, the creator has an exclusive property right in designs for works of ornament or utility until publication is permitted." William A. Meier Glass Co. v. Anchor Hocking Glass Corp., W.D. Pa.1951, 95 F.Supp. 264.

There can be no doubt that prior to the solicitation of bids plaintiffs, on the urging of Jones, furnished a custom stained art glass design created by Love. At the time it bid for the subcontract, Paddock did not have a design or any ideas for a design. During the preparation of its design Paddock had plaintiffs' design in its possession. Both Paddock and Pethick, prior to the construction and installation of the window, knew that it had been submitted by plaintiffs in accordance with the specifications calling for a custom design. It is also reasonable to infer that plaintiffs submitted their design in confidence with the understanding that only Lippi and the church board would see it, and that they would be paid if it was used or that it would be returned if not used. Trenton Industries v. A. E. Peterson Mfg. Co., S.D.Calif. 1958, 165 F.Supp. 523; Belt v. Hamilton Nat. Bank, D.C.D.C.1952, 108 F.Supp. 689; William A. Meier Glass Co. v. Anchor Hocking Glass Corp., supra.

Paddock has not argued against plaintiffs' contentions. Pethick argues that Paddock's design is not identical to plaintiffs', and that the use of the same symbols such as alpha, omega, I.H.S., and the Sunburst theme are not novel and have been used for years in many designs.

There is authority which holds that before property rights in a design can be acquired, the design must be reduced to concrete form [5] and it must be novel in the sense that it must be original with the person asserting the right and not already in use. William A. Meier Glass Co. v. Anchor Hocking Glass Corp., supra; Stevens v. Continental Can Co., 6 Cir. 1962, 308 F.2d 100. That plaintiffs' design embodies elements long in use does not of itself negate originality or novelty. Rather, the requirements of originality and novelty should be viewed in the entire context in which the elements are used. In Waring v. WDAS Broadcasting Station, Inc., supra, the court said:

" * * * The law has never considered it necessary for the establishment of property rights in intellectual or artistic productions that the entire ultimate product should be the work of a single creator; such rights may be acquired by one who perfects the original work or substantially adds to it in some manner. Thus, in Wood v. Boosey, 2 L.R.Q.B. 340, it was held that a person who arranged the score of an opera for the pianoforte thereby created an independent musical composition in which he had a right of property apart from that of the composer of the opera itself. In Walter v. Lane [1900] A.C. 539, it was held that one who reported for the Times a public address, together with a description of the meeting at which it was delivered, had property rights therein distinct from and additional to those of the speaker. The translation of a novel, or its dramatization, vests a distinct property right which is entitled to the same protection as is extended to the original. Fleron v. Lackaye, N.Y. Super., 14 N.Y.S. 292. A dramatic work, even though composed of selections from literary compositions which are public property, may possess such

---

5. The transparent sketches represent a reduction of plaintiffs' idea to concrete form.

originality in its construction, or be so unique in its dramatic effect, as to be the proper subject of protected ownership. Aronson v. Baker, 43 N.J.Eq. 365, 371, 12 A. 177 * * *"

Ideas were not suggested to plaintiffs. Their design was conceived by them and by Love. It consisted of a stained glass cross which extended from the ground to the peak of the roof. Where the cross bar traverses the vertical bar there is a sunburst design, with both straight and wavy rays emitting. The main window begins just above the doors. A star and a half moon are on the right and left side of the main window. Just below these and toward the center are the Greek letters "alpha" and "omega." To the right and left of the doors, and below the main window, are windows which contain a crown and "chi-rho." Plaintiffs contemplated that the cross would be outlined in aluminum and that the sun and emitting rays, and all of the symbols would be made of art glass panels surrounded by conventional stained glass and arranged to achieve the overall design.

■ Defendants' overall design has the same theme, a cross, a sunburst scene, and various symbols. A comparison of the designs shows clearly that plaintiffs' design was substantially copied. The differences are insignificant. Defendants used the same symbols as the plaintiffs, except the half moon and star for which a dove and I.H.S. were substituted. While the symbols are rearranged, they appear in the same places as in plaintiffs' design. The symbols are made of art glass panels and so are the sunburst and rays. The cross is wood as opposed to the glass cross proposed by plaintiffs but this is a difference mainly in the components rather than the design. While Kasmark testified that for many years he used sunburst designs and other symbols in designing windows, he did not say that he used them in the manner used by plaintiffs. Defendants produced no evidence of other window designs similar to plaintiffs'. It is clear that defendants wrongfully appropriated plaintiffs' design.

■ LIABILITY OF THIRD PARTY DEFENDANT: Although Paddock, the third party plaintiff, did not offer affirmative evidence of liability of the third party defendant Lippi, the evidence presented by plaintiffs will be considered in the third party claim. Bradford Builders, Inc. v. Sears Roebuck & Co., 5 Cir. 1959, 270 F.2d 649.

Paddock argues that it was only an agent of Lippi who should be responsible for its acts. Here, again, Paddock has failed to offer any evidence of agency and the evidence in the record does not establish it. The same considerations discussed in connection with Paddock's claim that it was the agent of Pethick apply.

Section 271 of Title 35 U.S.C.A. provides: "(b) Whoever actively induces infringement of a patent shall be liable as an infringer." In Fromberg, Inc. v. Thornhill, 5 Cir. 1963, 315 F.2d 407, 411, it is stated:

"* * * But civil culpability need not stop with the dealer who does the final act of making, using or selling. The prohibition of the law, now codified in § 271(b), extends to those who induce that infringement. Of course inducement has connotations of active steps knowingly taken—knowingly at least in the sense of purposeful, intentional, as distinguished from accidental or inadvertent. But with that qualifying approach, the term is as broad as the range of actions by which one in fact causes, or urges, or encourages, or aids another to infringe a patent."

The evidence establishes that Lippi aided the infringement by Paddock. Prior to the preparation of the guide specifications by plaintiffs, Lippi knew that plaintiffs had applied for a patent on art glass panels, but did not inform Paddock. Lippi used the guide specifications for the contract. Jones was at a meeting when the plaintiffs' panel was shown to Kasmark and its construction explained in detail. Lippi directed removal of the art glass panels so constructed after he was in-

formed that a patent had been issued to plaintiffs. Lippi rejected Paddock's request that an all conventional stained glass window be used because the church didn't want a conventional stained glass window. Lippi discussed the infringement with Paddock and instructed Paddock on how to build a sample window. Both Paddock and Pethick proposed a window with art glass panels which they determined would not infringe and sought Lippi's approval. This was the window installed. Since Lippi controlled the specifications, he must have approved. Time was short and construction had to be completed. Lippi aided defendants in the infringement.

Lippi also united with the defendants in appropriating the plaintiffs' design. He caused the design to be made. Prior to the preparation of Paddock's design, Jones turned plaintiffs' design over to Paddock even though it was intended for display only to the church board. Jones was at a meeting of the board when Paddock's design was compared with plaintiffs'.

Lippi offered evidence that under the specifications incorporated in the general contract, the contractor was required to furnish appliances under guarantee against infringement. The contract provided:

"Patents.

All apparatus, appliance or materials must be furnished by the contractor under guarantee against claims for royalties or infringements of patents."

In his brief Lippi cites this provision in support of his argument that responsibility for the infringement is on Paddock alone. Aside from the contract requirements, the actions of Lippi clearly establish his part in aiding the infringement, and thus he runs afoul of 35 U.S.C.A. § 271(b). Lippi did not offer this clause for the purpose of indemnification by Pethick. Even if it were offered for that purpose, it would not help him. Contracts indemnifying a party against his own torts are valid; however, the intention to include within the scope of an indemnity contract a loss due to the indem-

nitor's own tort must be expressed in clear and unequivocal language. See Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc., 1961, 404 Pa. 53, 59, 171 A.2d 185, 188:

" 'We think it clear, on reason and authority, that a contract of indemnity against personal injuries, should not be construed to indemnify against the negligence of the indemnitee, unless it is so expressed *in unequivocal terms.* The liability on such indemnity is so hazardous, and the character of the indemnity so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation. *No inference from words of general import can establish it.* The manifest purpose, in such cases, to indemnify against the injury which, under the circumstances, could reasonably be apprehended only from the action of the indemnitor or his servant, is a weighty consideration in construing indemnity contracts. * * * ' "

See also Dilks v. Flohr Chevrolet, 1963, 411 Pa. 425, 192 A.2d 682. The contract terms do not specifically require indemnity against Lippi's own infringement. If the clause is considered an indemnity clause, it must be construed as indemnifying Lippi against patent infringement by Paddock which might be imputed to Lippi, but not against infringement in which Lippi participated. Under the third party claim, Lippi is liable for infringement and for wrongful appropriation of property rights and, therefore, must pay one-half of the amount paid by Paddock in satisfaction of the judgment of plaintiffs against Paddock.

Finally, Paddock argues that plaintiffs have not proven any money damages and, therefore, only nominal damages can be awarded. Plaintiffs' complaint requests an accounting for profits and damages in connection with the patent infringement. It is the practice in patent infringement cases, and one made known by plaintiffs at the trial and not objected to by defendants or

third party defendant, that proceedings to establish the extent of damages through an accounting follows, as a separate trial, after liability is established. This procedure is of long standing and will be followed here. Sinclair Refining Co. v. Jenkins Petroleum Process Co., 1933, 289 U.S. 689, 693–694, 53 S.Ct. 736, 77 L.Ed. 1449.

Accordingly, this court finds claim No. 3 of plaintiffs' patent to be valid and infringed by defendants, Paddock and Pethick, and third party defendant, Lippi. This court further finds that defendants, Paddock and Pethick, and third party defendant, Lippi, wrongfully appropriated plaintiffs' design in which plaintiffs had a common law property right.

An accounting for damages under 35 U.S.C.A. § 284 pursuant to these findings and conclusions and opinion will await either appellate review or the expiration of the time for taking an appeal, if none is taken.

Defendants and third party defendant will be enjoined from further infringement of claim No. 3 of Patent No. 3,064,380.

A form of order in accordance with these findings of fact, conclusions of law and opinion is to be submitted.