**In re ELSINORE SHORE ASSOCIATES, d/b/a the Atlantis Casino Hotel, Elsinore of Atlantic City, Elsinore of New Jersey, Inc., Elsub Corporation, and Elsinore Finance Corporation, Debtors.**

**Bankruptcy No. 85–06058.**

United States Bankruptcy Court,
D. New Jersey.

July 19, 1989.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by Karen A. Giannelli, Newark, N.J., for debtors.

Saul, Ewing, Remick & Saul by Francesca E. Seltzer, Marlton, N.J., for Mecklerstone, Inc.

## OPINION

ROSEMARY GAMBARDELLA,
Bankruptcy Judge.

The matter before the court involves the debtors' motion to expunge a proof of claim filed by Mecklerstone Inc. ("Mecklerstone") in the amount of $115,200.00 pursuant to 11 U.S.C. § 502(a) and Bankruptcy Rules 3007 and 9014.[1] Prior thereto on April 18, 1985 Mecklerstone filed of a proof of claim against Elsinore Shore Associates, d/b/a the Atlantis Casino Hotel ("Atlantis" or "debtor") pursuant to Bankruptcy Rule 3001 in the amount of $115,200.00 (D–1). On January 14, 1988 the debtors filed a Notice of Third Omnibus Objections to Claim Pursuant to § 502(a) and Bankruptcy Rules 3007 and 9014. Mecklerstone filed an objection to the debtors' motion.[2] Mecklerstone alleges that Atlantis wrongfully appropriated certain of its ideas for a special promotion entitled "THE TREASURE OF ATLANTIS", by implementing a promotion called "TREASURES OF ATLANTIS SWEEPSTAKES" and seeks damages for breach of an implied contract, including out of pocket expenses, and lost profits. For the reasons that follow, claim # 459 filed by Mecklerstone in the amount of $115,200.00 is hereby expunged. The following constitutes this court's findings of fact and conclusions of law.

On November 14, 1985 Elsinore Shore Associates, d/b/a The Atlantis Casino Hotel filed a voluntary Chapter 11 bankruptcy petition pursuant to the Bankruptcy Reform Act of 1978 as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("Bankruptcy Code") and was thereafter continued as a debtor-in-possession. On July 24, 1987 Elsinore of Atlantic City (EAC), Elsinore of New Jersey, Inc. (ENJ), Elsub Corporation (Elsub), and Elsinore Finance Corporation (EFC) filed voluntary Chapter 11 bankruptcy petitions under the Bankruptcy Code and were thereafter continued as debtors-in-possession. Also on July 24, 1987, this court entered an order directing the joint administration of the Chapter 11 estates of EAC, ENJ, Elsub and EFC under Case No. 85–06058. The debtor, Atlantis, is a partnership which at the time of the filing of the Chapter 11 petition operated the Atlantis Casino Hotel.[3] The casino hotel facility includes 500 guest rooms and a multilevel casino and is located at 2500 Boardwalk, Atlantic City, New Jersey. On June 30, 1988, the court entered an order confirming a joint Plan of Reorganization. No appeal having been taken from the Order, it became final on

---

1. Plaintiff's proof of claim was originally filed in the amount of $115,200.00 and reduced thereafter at trial to $100,000.00, to delete a claim for punitive damages (Tr. of March 15, 1988 at 42–43).

2. See Letter objection from W. Jeffrey Garson, Esquire of Saul, Ewing, Renick & Saul, to Karen A. Giannelli, Esquire of Crummy, Del Deo, Dolon, Griffinger & Vechione filed on February 8, 1988.

3. On April 7, 1989 the New Jersey Casino Control Commission ("CCC") pursuant to the New Jersey Casino Control Act, N.J.S.A. 5:12–1 et seq. ("Act"), denied ESA's application to renew its casino license, which license expired on April 14, 1989. On April 13, 1989 the CCC appointed Joseph M. Nolan as conservator to take title to the property of ESA pursuant to the provisions of the Act. By order entered May 18, 1989 by the CCC, ESA's casino was ordered closed on May 22, 1989. By subsequent order of this court dated June 28, 1989 the Atlantis Casino Hotel, together with related assets, was sold to DJT Acquisitions Corp.

July 15, 1988. The "Third Amended Plan of Reorganization" became effective on September 30, 1988.

Trial on this matter commenced on March 15, 1988 and continued on April 4, 1988 and May 2, 1988.[4] Jeffrey F. Meckler, President of the Mecklerstone, testified on behalf of Mecklerstone; Mary Jane McHugh, Director of Casino Services for Atlantis, and Director of Slot Marketing at all times herein relevant, testified on behalf of the debtor.

Mecklerstone is a Pennsylvania corporation located at 112 North 12th Street, Philadelphia, Pennsylvania. Mecklerstone is a direct response, direct mail and special promotions advertising agency (T1 at 6 and 12). These special promotions include games, contests and various other promotions designed to bring customers to a Mecklerstone client's place of business (T1 at 12). According to Meckler, he has created fifteen to twenty special promotions since he started in the business in 1969 and in each case a written proposal was submitted of which 15 were sold to casinos (T1 at 11–12; T1 at 91–92). Approximately five of these proposals involved promotions in the form of games (T1 at 92). Approximately two-thirds of Mecklerstone's proposals are prepared for New Jersey casinos (T1 at 13 and 92).

Mary Jane McHugh is the Director of casino services for Atlantis and has acted in this capacity for about one year and a half (T2 at 4). In her six years of employment at the Atlantis, McHugh has held other positions including, slot marketing director (from May 1984 to the beginning of 1987), special projects manager and assistant to the treasurer (T2 at 4–5).

Meckler and McHugh have differing recollections as to the following material facts: (1) who initiated the business relationship between Mecklerstone and The Atlantis; (2) the degree of enthusiasm with which Mecklerstone's proposals were received by Atlantis; (3) whether any agreement ever existed between the parties; and (4) the similarities between the actual Atlantis promotion and the Mecklerstone proposals.

According to Meckler, Mecklerstone was recommended to Atlantis by one Frank Castle (T1 at 13–14; T1 at 45). Castle was a sales representative for a printing company known as Webcraft, Inc., and a business associate of Meckler's (T1 at 13–14). Meckler testified that Castle set up the first meeting between Atlantis and Mecklerstone which occurred on November 29, 1984 because Castle knew that Atlantis was looking for an advertising agency to help them with a new Atlantis promotion, and that Atlantis knew Castle was setting the meeting up (T1 at 13–14; T1 at 45). Meckler stated that, while Castle solicited Mecklerstone's attendance at the first meeting between the parties (T1 at 45; T1 at 126), it was Atlantis that contacted Meckler next when Christopher Gibbons, Atlantis' vice-president of marketing, telephoned Meckler the Monday after Thanksgiving 1984 and charged Mecklerstone with the assignment of developing a promotional idea for Atlantis (T1 at 15–16, 125–126). It is plaintiff's position that the foregoing facts constitute an invitation or solicitation of business by the Atlantis (*see* T1 at 126; Trial Memorandum of Mecklerstone, Inc. at 1).

According to McHugh, attendance by Mecklerstone at the first meeting between the parties was not solicited and was set up between Atlantis and Webcraft (T2 at 6; T2 at 67). At trial, McHugh explained that Webcraft, Inc. was a leading manufacturer of lottery tickets and different promotional items, and that Atlantis consulted them regarding, among other things, the cost of printing materials, the probability of winners, and Webcraft's possible involvement in an Atlantis promotion (T2 at 6–7). McHugh testified that Webcraft brought representatives from Mecklerstone to the initial meeting between the parties, at which time Webcraft indicated that Webcraft and Mecklerstone previously worked together and asked Atlantis' permission for the representatives from Mecklerstone to

---

**4.** Reference to the trial transcripts of March 15, 1988, April 4, 1988 and May 2, 1988 are hereinafter referred to respectively as "T1 at ——," "T2 at ——" and "T3 at ——."

sit in at the first meeting (T2 at 6–7). According to McHugh, Meckler asked if he could submit a proposal to Atlantis to take the promotion and implement it and a second dinner meeting was set up to discuss in further detail the guidelines and objectives Atlantis sought to achieve (T2 at 16). McHugh further testified that Atlantis did not give Meckler an assignment (T2 at 9, 19; T2 at 71–72).

The initial meeting between the parties was held on November 28, 1984, the Wednesday before Thanksgiving (T1 at 14) (hereinafter "First Meeting"). Those present at the meeting included: Jeffrey F. Meckler; Mary Jane McHugh; Frank Castle; Joanne Stone, vice president in charge of production for Mecklerstone; Christopher Gibbons, Atlantis' vice president of marketing; Johann McIlwayne, an Atlantis advertising director (T1 at 14–15); and possibly Darlene Hershwin, Atlantis' advertising director (T2 at 67). Both parties agree that the purpose of the First Meeting, and the purpose of Atlantis' desire to develop a promotion at the Atlantis facility (discussed *infra*), was to discuss the creation of a promotion to address Atlantis' traffic flow problem (T1 at 15) (T2 at 7). The Atlantis Casino Hotel consists of two connected buildings, each of which is three levels. Because of the buildings' layout, the casino encountered the problem of patrons entering the building from the boardwalk, utilizing the casino facilities on the first level only, and then leaving the building without knowledge of the facilities on other levels, including additional casino levels and restaurants (T2 at 7–8). Atlantis' objective in running the promotion at issue was first, to educate patrons with respect to the casino's property, and second, to provide certain patrons with coin packages an incentive to stay in the building and ultimately increase their return visits to the casino (T2 at 7–8). Atlantis' traffic flow problem and the objectives behind running the promotion at issue were discussed at the First Meeting. In addition, Mecklerstone presented Atlantis with work from its portfolio regarding projects done for other casinos (T1 at 15) (T2 at 9–10). According to McHugh, Mecklerstone re-

quested an opportunity to submit a proposal to Atlantis at the First Meeting (T2 at 9). McHugh also testified that prior to the First Meeting, Atlantis did not intend to use an outside advertising agency to develop the promotion, because the Atlantis was already working with in-house counsel and marketing staff to develop a concept for a promotion (T2 at 9). McHugh also stated that the First Meeting was set up between Atlantis and Webcraft people so that Atlantis could obtain information from Webcraft regarding printing costs and other items for the promotion material (T2 at 9).

According to Meckler, after the First Meeting, Christopher Gibbons telephoned him on December 3, 1984, expressed interest on behalf of Atlantis in procuring Mecklerstone's help with the Atlantis promotion, and set up a meeting for that night to further discuss the promotion (T1 at 15–17). Meckler testified that as a result of that phone call Mecklerstone was charged with the assignment of developing a promotional idea for the Atlantis (T1 at 16). The parties met at Atlantis' Empress Restaurant (hereinafter "Second Meeting"). Meckler testified that the participants at the Second Meeting included himself, Christopher Gibbons, and Mary Jane McHugh (T1 at 17). At that time Atlantis gave Mecklerstone a five point list which outlined a "Find Your Slot" (P–1; D–4) promotion which Atlantis was then working on (T1 at 17) (T2 at 17) (hereinafter "Find Your Slot Outline"). This Outline, entered into evidence at trial as Exhibit P–1 and D–4, was developed by McHugh in her capacity as slot promotion director (T2 at 68), and read as follows:

ELSINORE SHORE ASSOCIATES

"FIND YOUR SLOT"

GAME PROMOTION

Elsinore Shore Associates (ESA) plans to implement a promotion utilizing bonus slot cards. The basic concept is as follows:

 1. Bonus slot cards will be distributed from the main coin redemption

cage on Level I to any patron who presents either a current dated parking receipt or an Atlantis coin voucher.

2. The face of each bonus slot card will depict three reels of a slot machine each containing one common reel symbol—i.e., cherry, bar, bell, etc. These three symbols will represent a possible combination on an actual slot machine game.

In addition, each bonus slot card will contain a rub-off area which, when exposed, will reveal a specific casino location (casino level and slot zone).

3. A prize, consisting of goods and/or services, will be awarded to any patron who locates a slot machine that;
–is in the casino location indicated on his/her bonus card, and
–is displaying the exact same symbol combination (in same order) as their bonus card on the center line on any three consecutive reels, either from left to right or right to left.

4. A slot shift supervisor will be required to verify that symbol combination and location of slot machine matches that appearing on bonus slot card prior to issuing prize.

5. No casino play required.

(P–1) (D–4).

At the time of the Second Meeting, Atlantis had already submitted the "Find Your Slot Outline" to the New Jersey Casino Control Commission ("CCC") for their reaction as to the legality of the proposed promotion (T2 at 18; T2 at 69–70) and Meckler was so advised (T2 at 69). McHugh testified that the "Find Your Slot Outline" was the only written material Meckler received from Atlantis at that Second Meeting because Atlantis did not anticipate utilizing an outside firm and had not prepared any outline or other material (T2 at 19). McHugh further testified that the list was not given to Meckler as a guide; but for information purposes only (T2 at 70). Meckler, on the other hand, testified that Atlantis gave the "Find Your Slot Outline" (P–1) to Meckler to "show us [Mecklerstone] the line of their thinking up to that point and to have us take it and make it into a real promotion" (T1 at 18). Meckler testified that he was given the "Find Your Slot Outline" as a general, very loose outline (T1 at 18). Meckler also testified that as a result of the Second Meeting, he was of the understanding that he was "charged" with the assignment of developing a promotion for Atlantis; and that Mecklerstone was thereby basically working for Atlantis (T1 at 48–50).

Meckler testified that a certain letter dated December 6, 1984 to Christopher Gibbons from Meckler ("Proposal 1") was given by him to Atlantis at a third meeting between the parties on December 7, 1984 (hereinafter "Third Meeting") (T1 at 19–20).[5] Proposal 1 provided:

Dear Chris:

Thank you for this opportunity to submit our ideas for the development of your "Find Your Slot" concept as an on-floor promotion for Elsinore Atlantis.

The first thing we'd like to address is the name of the promotion. While "Find Your Slot" is catchy, it's also very generic. You would be better off with a name that lends itself to your property … a name that captures the essence of your operation (and of the casino experience in general) … a name like …

## THE TREASURE OF ATLANTIS

This name would facilitate the achievement of your goals. For example …
TREASURE MAPS

Instead of game cards, our game device would be a treasure map. This piece would, of course, include a game card. But it would also include a stylized floor plan of your entire casino. This would primarily be used by the customer to locate his/her slot zone. It would also serve to familiarize your players with the layout of your facility.

---

**5.** This letter was entered into evidence at trial as P–2, and was also attached to Mecklerstone's proof of claim (D–1). The court here notes that its reference to Mecklerstone's submissions as "Proposal 1" and "Proposal 2" does not constitute a finding of fact; the designations are used for purposes of clarity only.

The game card portion of this piece would perf off so it could be deposited for the second chance drawing while the map portion stayed with the customer. (More on the second chance drawing in the Game Play section of this proposal).

MASCOT

As part of this promotion, we would like to develop a mascot for Atlantis. This character would embody the magic, romance and excitement to be found on your property.

Given the nautical nature of your name, a mermaid would be conceptually perfect. Elegant, alluring, sexy, fun ... a treasure in her own right ... she's just about everything you'd expect to find in a world-class casino.

We've worked up some preliminary sketches on how we intend to use her for our promotion. On these sketches she takes the form of a holigraphic display in your lobby. In this capacity she'll tell your customers how they can find the TREASURE OF ATLANTIS and where they can get their treasure maps.

After this game she can be reprogrammed for general use or for your next promotion. She could also be considered for use in your general print and broadcast campaigns.

GAME PLAY

The basis of play would be as you've conceived it ... that is players matching the symbols on their treasure maps with those on actual slot machines.

In order to conduct the game in this manner we would have to eliminate some of your slots from the game. Specifically those machines which employ only bars and ghosts on the reels would have to be eliminated from game play.

Among the other machines, most of them display six standard slot symbols—Cherries, Oranges, Plums, Bells, Bars and Sevens. These would be the symbols we'd use for our game.

Each game card would have three of these symbols printed on it. It would also contain a "Treasure Zone" (TZ) corresponding to a zone shown on the Treasure Map.

To play, the customer would have to go to the TZ indicated and "find" a slot machine whose first three windows (left to right) matched the game card.

Assuming that each of our six symbols had an equal probability of showing up in a given slot machine window (a totally invalid assumption) a players odds of hitting the game would be 216:1 (6x6x6).

Therefore we've created a fairly easy game to hit. . A slot player with an average budget ($200.00) could be fairly sure of matching his/her card during the course of play.

Non-players should be able to find their slot by wandering around the TZ long enough.

Therefore it is essential that the prize schedule be structured carefully as we fully expect 25% of the players to hit the game.

That's OK. In fact it's desireable. We want a game that people can win. We just have to be sure that the majority of prizes are of the "souvineer" variety—dice keychains, sun visors, etc. These minor prizes, of course, would be supplemented by prizes of greater value—show tickets, free dinners, complimentary weekends and the like. Naturally there would be far fewer of these prizes.

To maintain player interest we propose that the exact prize be kept a mystery until the winning ticket is verified. This could be easily accomplished by use of a rub-off or tear-tap on the game card. That way each ticket could be a potential grand prize winner ... which brings us to ...

GRAND PRIZE

To give this promotion value and added excitement in the eyes of your customers we propose that you build a grand prize into the game. This prize almost has to be a treasure chest filled with gold jewels. Suggested retail value of this treasure should be in the $25,000–$50,000 range.

Each ticket would have the potential of winning the Treasure instantly (pending a slot machine match, of course). But in

actuality we would structure the game so that winning the prize this way would be highly improbable. This would set up our ...

## SECOND CHANCE DRAWING

The law states that if we offer a Grand Prize it must be awarded. This we turn into a plus by having a second chance drawing for all non-winners of the Grand Prize.

Upon collecting the game prize or upon leaving the property if they don't hit the game, the players will fill in their names, addresses, and phone numbers on their game cards and deposit them in your game barrel. After the promotion (approximately 100 days) a drawing will be held with the winner getting the Treasure Chest. (Providing nobody has won it, of course).

This will enable us to capture the names of most of the people who come to your casinos ... a valuable commodity for your own use and/or as a separate profit center by means of outside rental (this will be the topic of a future proposal).

Chris, this is the basic promotion as we see it. It definitely meets the three parameters of a successful casino event. Namely ...

## IT GETS THEM IN

We believe THE TREASURE OF AT-LANTIS will be a strong traffic builder. The Mermaid Display alone will play an important role in bringing the people in. The prospect of winning a large instant prize is a good reason to come to Atlantis.

## IT KEEPS THEM IN

... and in your case, in the exact area where you want them. In the case of players the prospect of matching their game cards and winning the Treasure Chest should keep them at your machines longer as opposed to walking down the boards.

## IT BRINGS THEM BACK

The game itself is strong enough to get them back on their next visit. However there are a few more little wrinkles along these lines which I will divulge at our:

## FORMAL PRESENTATION

This is where we spell out every detail of your promotion. You receive:

A. Comprehensive drawings of your Mermaid Display along with complete building specifications and a four minute script.

B. Copy and design for your Treasure Map/Game Cards, promotional materials and all other collateral pieces we see fitting this promotion.

C. A complete outline of the details of the game suitable for submission to the CCC. (You have to fill in the internal procedures, but the game itself will be ready to submit.)

D. Mecklerstone will interface with your legal people to develop a set of rules and conditions that protect Atlantis, yet do not scare people away from the game. In addition once the game is approved we:

E. Interface with WebCraft (a leading manufacturer of gaming devices for promotions like this) on the production of your Treasure Maps. (WebCraft will bill you directly for the cards themselves.)

F. Act in the capacity of your independent gaming agency for the second chance draw.

G. Work with you on internal procedures to insure the smooth and orderly introduction of the game into your facility.

H. Prepare mechanicals for your Treasure Hunt pieces.

Our fee for this involvement is $20,-000.00. An estimate of all the costs for implementation of THE TREASURE OF ATLANTIS GAME is:

| | |
|---|---|
| Mecklerstone | $ 20,000.00 |
| Mermaid Display Construction and installation. | 35,000.00 |
| Treasure Maps | 63,500.00 |
| Collection Materials (posters, mailings, etc. | 15,000.00 |
| Total | $133,500.00 |

As for breaking this promotion to the public, word about these things has a way of spreading fast, so I wouldn't rec-

ommend spending too much on media. However a little push at the beginning of the promotion wouldn't hurt. I see a mailing to your house lists, tags on prints ads and few radio spots as sufficient. Also (if you're so inclined) the mermaid would make a great subject for a billboard.

TIMETABLES

Chris, with the holidays coming up, a realistic target date for presentation of copy, design and gaming outline (everything you need for submission) is the first week in January (3 weeks). Assuming a smooth submission and approval process, the game could be up and running mid to late February.

I think we have a winner here ... completely unique to your property. We look forward to working with you to make it a success.

Sincerely,

Jeffrey F. Meckler

President

(P–2). According to Meckler, he submitted preliminary sketches of a game card and a sketch of a mermaid display to Atlantis along with Proposal 1 (P–2) (T1 at 19, 60–61; D–2). Meckler testified that at the December 7, 1984 meeting the entire proposal of Mecklerstone was discussed including the fee for Mecklerstone's involvement in the project if its ideas were used (T1 at 33–34). Meckler testified that there were three additional meetings after the Third Meeting, as well as numerous phone calls between the parties, including Mary Jane McHugh, Christopher Gibbons and Johann McIlwayne, to get the promotion in a workable state (T1 at 23–24), including its submission to the Casino Control Commission for review. Meckler further testified that Atlantis' reaction to Proposal 1 was one of elation (T1 at 49), and that Atlantis representatives never implied they were not interested in accepting Mecklerstone's proposal just because all of the details were not worked out (T1 at 59; *see also* T1 at 122 and T1 at 135). Meckler suggests that constant contact between the parties was maintained several weeks following the Third Meeting because Atlantis

wanted the promotion up and running during the winter months of 1985 and certain details, including the creative work and CCC submissions, had to be addressed in order to put the promotion in a "workable" condition (T1 at 23–24; T1 at 59).

While Meckler testified that Proposal 1 was not accepted by Atlantis exactly as submitted (T1 at 23), it was his understanding that Atlantis had an obligation to Mecklerstone if the ideas were used (T1 at 50).

On January 17, 1985 Meckler sent Gibbons the following letter (hereinafter "Proposal 2"):

Dear Chris:

As we discussed at our January 9 [sic] meeting, there are some very real problems with using actual slot machines as the basis of game play on your "Treasure of Atlantis" promotion.

The solution to these problems is simple ... we eliminate the actual slots from the game and substitute a series of display units (one in each Treasure zone).

Basically, the display units accomplish the major goal of the promotion ... distributing customers evenly throughout your property and keeping them there without creating hassles at the machines. They also allow us to control the amount of winners.

Here's how we see them working:

The Mecklerstone will construct and install 12–15 display units throughout your property. Sketches of these units are attached. The elements of the game are essentially the three mermaids pictured on these sketches.

Every twenty minutes the position of the mermaids change on the display units.

Players would be handed game cards (Treasure maps), part of which would be a 15 square configuration to match the display unit with three mermaids ink-jetted in three squares.

If the mermaids on the player's map match the mermaids on the display, the player wins and has 20 minutes to claim his/her prize.

Interestingly, the configuration we've developed gives the player exactly a 100:1 chance of winning every time the mermaids change. Given your desire to direct 200 players to each zone, and to award two prizes per zone every time the display changes, you should be pleased to learn that this 15 square configuration meets these parameters exactly.

The Atlantis logo in the center square never changes. Therefore, the odds of matching the display are $5 \times 4 \times 5$ or 100:1.

To insure people stay in the zones they're sent to, each display unit in each treasure zone will be an independent game. In other words the mermaids would be in different positions on each board. A person with a TZ 1 map couldn't play in TZ 15 because even if she/he matched the TZ 15 display the game card wouldn't be valid.

Cost for construction and installation of 12 of these units would be $69,526.80. After the game ended, the units would have to come down. However, you would have 8-bit data lines running to 12 spots on your property. With these installed, it would be an easy matter to hook up to your LCD display monitors for sports results, stocks, messages, etc.

Chris, I believe that by going the display unit route, "The Treasure of Atlantis" once again becomes a viable promotional idea for traffic distribution and reducing your walk factor during the balmy summer months.

Sincerely,

Jeffrey F. Meckler

President

(P–3).

At trial, Meckler referred to Proposal 2 as a refinement of Proposal 1 and the result of subsequent meetings with Atlantis (T1 at 62; T1 at 121). According to Meckler, Atlantis' reaction to Proposal 2 was very favorable (T1 at 63) and the parties had a meeting on January 18, 1985 and their final meeting on January 25, 1985 ("Final Meeting") "to just wrap things up" so that Mecklerstone could begin developing the materials necessary for the pro-

motion (T1 at 26). Meckler testified that his promotion had little resemblance to Atlantis' "Find Your Slot" outline, in that the former employed a different name ("Treasures of Atlantis"), did not involve slot play, and utilized a map (T1 at 29–30).

Meckler testified that at the time of the Final Meeting he was informed by Christopher Gibbons that Atlantis was a few days away from getting final approval for the promotion and that Mecklerstone would hear from Atlantis early the next week (T1 at 27).

By February 7, 1985 Mecklerstone had not heard from Atlantis since the Final Meeting so Meckler sent the following letter of same date to Gibbons (T1 at 28; T1 at 65):

Dear Chris,

As of this date, The Mecklerstone, Inc., has received no response from you regarding our proposals on the "Treasure of Atlantis" promotion which we developed for you.

I will assume that if you or another authorized representative of Atlantis does not approve or reject our proposal within seven (7) working days from the date of your receipt of this certified letter, Atlantis is not interested in doing business with the Mecklerstone at this time.

If this is the case, I'd like to take this opportunity to ask you to return the sketches of the display units which were prepared for you. I also wish to remind you that the "Treasure of Atlantis" and all the concepts outlined in my letters of December 6, 1984, and January 17, 1985, were prepared for you at no cost and as such remain the property of the Mecklerstone.

Chris, should there be a renewed interest in this project, or should you wish to consult with us on other advertising or marketing jobs, please do not hesitate to call.

Sincerely,

Jeffrey F. Meckler

President

(P–4). Meckler explained that contact with Atlantis up to the Final Meeting was prac-

tically on a daily basis (T1 at 27–28). He stated that as a result of his February 7, 1985 letter to Gibbons, McHugh telephoned him to advise him that Atlantis did not intend to run a traffic-related promotion due to budgetary problems (T1 at 29). Meckler testified that it was his intention at that time not to charge Atlantis for any work already performed, but that if Atlantis were ever in a financial position to use his idea they would pay him for it accordingly (T1 at 66).

McHugh testified that Atlantis upon receiving Proposal 1 along with a mermaid sketch (D–2), wanted to specifically evaluate the use of a mermaid and also consider the expense of the proposition because Atlantis had recently shed the Playboy Bunny image (T2 at 42).[6] According to McHugh, prior to communicating to Mecklerstone a rejection of Proposal 1, Atlantis advised Meckler in early January, 1985 that the CCC reacted negatively to the use of a real slot machine in a game promotion and advised Meckler that that idea not be worked on any further (T2 at 44) and that Meckler nevertheless asked to submit a second proposal that would alleviate the problem with the CCC (T2 at 43). Mecklerstone subsequently submitted Proposal 2, which included the use of monitors instead of slot machines (T2 at 44). Atlantis' reaction to Proposal 2, according to McHugh, was that it was costly and likely unuseful since Atlantis wanted to implement a quick promotion and the monitors involved delay (T2 at 45). McHugh testified that Atlantis rejected Mecklerstone's Proposal 2 in response to Meckler's letter of February 7, 1985 (T2 at 45). Upon Gibbons' instruction, McHugh herself notified Meckler of the rejection, and subsequently instructed her secretary to return Mecklerstone's material to it, including Meckler's original proposal and two mermaid sketches (T2 at 47, 85–86). Meckler testified that when Atlantis decided not to go ahead with Mecklerstone's promotion certain documents, including specifications which had been sub-

mitted by Mecklerstone to Atlantis were not returned (T1 at 84–85). Meckler admitted however that many of his office files had been lost (T1 at 86). Meckler testified that he eventually learned of Atlantis' "Treasures of Atlantis Sweepstakes" in December 1985 while patronizing the casino, when he heard the Sweepstakes announced over the casino's public announcement system (T1 at 30–31, 110–111).

This brings us to a description of the actual promotion implemented by Atlantis. The "Treasures of Atlantis Sweepstakes" promotion was run by Atlantis from September 1985 to January 1986 (T3 at 7–8) and was played as follows. A patron picked up a game card (D–3; P–5) ("Entry Form") at the casino, along with a map of the casino (P–6). Apparently the game card or sweepstakes' Entry Form, was inserted in the map (P–6) and distributed to patrons (T1 at 31–32). The Entry Form was a four sided promotional piece prepared by an advertising agency known as CRC Advertising, the same company that, according to Atlantis, created the "Treasures of Atlantis Sweepstakes" (T3 at 8).

Side one of the Entry Form announced:

## TREASURES OF ATLANTIS SWEEPSTAKES

Every Month

A Grand Prize Drawing

Every Day Sensational Prizes

Every Time You Visit More Ways to Win In Our Three Places to Play

Side one also provided basic information about the Sweepstakes including (1) possible prizes (A Merkur XRATI Sports Coupe; a QE2 Cruise from Singapore to Hong Kong; a tour of Rome, Florence, Naples; a Riverboat adventure on the Mississippi; a mink coat); (2) how to enter ("fill-out the attached entry form and deposit it in one of our Three Treasure Drums"); (3) number of drawings a day (45) and length of pro-

---

**6.** On June 5, 1984 a press release announced a new name and new symbol for the then Playboy Hotel and Casino. The name of the casino hotel was changed from the Playboy Hotel and Casi-

no to The Atlantis Casino Hotel. The Playboy Bunny was replaced with a new Atlantis logo in the shape of a seashell (D–8).

motion (daily drawings through January 31, 1986); (4) how to claim your prize ("proceed to the " 'Treasure Island' Promotion Area" and select your Treasure hidden in a sealed envelope"); and (5) how to win the grand prize ("all entries will be automatically dropped in the "Grand Prize Sweepstakes Drum" at end of each day, from which there are four monthly Grand Prize Drawings).

Side two of the Entry Form specified how to play the Sweepstakes and read in relevant part:

You must use an official Discover Atlantis Map along with the attached entry form. Complete the form (being certain to include your name, address and map number) and deposit the form in any one of the three Treasure Drums at the following locations:

Shangri-la Casino Floor

★ "Treasure Island" Promotions Area
★ Skywalk Promotions Area

Restaurant Floor

★ Poster location number 14 at the escalators

TO BE ELIGIBLE, YOUR ENTRY FORM MUST INCLUDE YOUR NAME, ADDRESS AND MAP NUMBER.

Limit one entry per person, per day; multiple entries will be disqualified. Drawings are held daily through January 31, 1986. Nine winning entries will be drawn at 1PM, 3PM, 5PM, 7PM and 9PM daily. Winning numbers are posted near each of the three Treasure Drums until the next drawing begins.

If you are a winner, claim your winning map and valid I.D. to the Atlantis representative at the "Treasure Island" Promotions Area before the next drawing or by 10PM for the 9PM drawing. (Identification and map number must match entry form exactly.

(P-5; D-3). Side two also noted in bold print: "REMEMBER, SAVE YOUR DISCOVER ATLANTIS MAP. ITS YOUR KEY TO THE TREASURES."

Side three consisted of two maps or diagrams and the actual Sweepstakes Entry Form. One of the maps depicted the "Shangri–La Casino floor" and the other depicted the "Restaurant floor"; both maps indicated where Entry Forms should be deposited (i.e., apparently the "Treasure Drum" locations). Side four of the Entry Form set forth the Official Rules and that "no casino play required" and provided another map of the Shangri–La Casino floor and spelled out where Sweepstakes' winners could claim their prizes. Small arrows on the map pointed to the " 'Treasure Island' Promotions Area."

As previously mentioned, the Entry Form was inserted into a more comprehensive casino map (P-6), hereinafter called the "Discover Atlantis Brochure" or "Brochure." According to McHugh the Brochure was a promotional piece developed by CRC Advertising for Atlantis (T2 at 23). McHugh testified that at that time CRC was walked through the Atlantis building and shown the areas Atlantis wanted to emphasize to patrons. CRC was also given some preliminary diagrams of the building done in May 1984 by Lou Fuano, Atlantis' in-house artist (D-5); (T2 at 21, 23). McHugh testified that Atlantis began distributing the Brochure (P-6) as maps of the premises in May 1985 for the sole purpose of guiding people around the building (T2 at 47). McHugh testified that the maps were handed out in May 1985 and continued throughout the summer (T2 at 48). McHugh testified that Atlantis tied a pro-

motion (D–3) to the map (T2 at 48). McHugh testified that CRC Advertising, which originally developed the layout and printed the maps for Atlantis, also developed the Treasures of Atlantis Sweepstakes (T2 at 49). This piece employed the slogan "Discover Atlantis" and included a map of each of Atlantis' five floors, along with brief descriptions of the unique qualities of each floor, the diverse gaming experiences within the same casino, and three of the hotel's restaurants. The upper right hand corner of the map included the following message:

#### "FIND YOUR SLOTS"

To help you quickly find the slot machine you wish to play, the color light at the top of each machine tells you its denomination. Nickles-red. Quarters-yellow. Halves-orange. Dollars-blue.

Beneath each of the three casino maps was a map key which identified the locations of the slot areas, blackjack, craps, roulette, baccarat and Big 6 games. According to McHugh, the function of the Discover Atlantis Brochure when it was originally introduced in May 1985 was to familiarize customers with the casino facility, outlets, restaurants and casino game locations and was distributed in various ways, from valet parking, hotel guests, bus patrons and the general public from regional offices (T2 at 24). The court here notes that the word "treasure" or the name "Treasure of Atlantis" do not appear on the Brochure (P–6).

■ This matter is governed by the leading case on the appropriation of ideas in New Jersey, *Flemming v. Ronson Corp.*, 107 N.J.Super. 311, 258 A.2d 153 (Law.Div. 1969), *aff'd*, 114 N.J.Super. 221, 275 A.2d 759 (App.Div.1971). The *Flemming* court explained:

> Where there has been an unsolicited submission of an idea, as here, the question which arises is whether, on the facts presented, the recipient is liable, if at all by reason of a *quasi*-contractual obligation based upon the doctrine of unjust enrichment.
>
> An idea, as distinguished from the copyrighted contents of a book or a patented

device or process, is accorded no protection in the law unless it is acquired and used in such circumstances that the law will imply a contractual or fiduciary relationship between the parties.

*Id.* at 315, 258 A.2d 153 (citations omitted). A cause of action for the appropriation of ideas may be sustained where a party discloses a novel idea to another party with the intention that the latter may use the idea and compensate him for such use. *Id.* at 317, 258 A.2d 153. *See also McGhan v. Ebersol*, 608 F.Supp. 277, 284 (S.D.N.Y. 1985). Under *Flemming*, the party seeking relief for the misappropriation of an idea must prove three separate elements:

(1) that the idea was novel;

(2) that the idea was made in confidence; and

(3) that the idea was adopted and made use of.

*Flemming*, 107 N.J.Super. at 317, 258 A.2d 153, *citing Mitchell Novelty Co. v. United Mfg. Co.*, 199 F.2d 462 (7th Cir.1952); *DeFilippis v. Chrysler Corp.*, 53 F.Supp. 977 (D.C.N.Y.1944), *aff'd* 159 F.2d 478 (2d Cir. 1947), *cert. denied* 331 U.S. 848, 67 S.Ct. 1733, 91 L.Ed. 1857 (1947); *Official Airlines Sched. Inform. Serv., Inc. v. Eastern Airlines*, 333 F.2d 672 (5th Cir.1964).

■ Additionally, a mere abstract idea, incapable of material embodiment, cannot be the subject of a claim for conversion and misappropriation. Instead to succeed on such a claim the idea must be concrete. *See Flemming*, 107 N.J.Super. at 316, 258 A.2d 153; *McGhan v. Ebersol*, 608 F.Supp. at 284.

In order to be novel an idea must be sufficiently concrete. *See Rowe v. Golden West Television Productions*, 184 N.J.Super. 264, 270, 445 A.2d 1165 (App.Div.1982), *certif. denied*, 91 N.J. 241, 450 A.2d 562 (1982) (novelty as it relates to common law copyright claim requires a concrete expression of an idea); *O'Brien v. RKO Radio Pictures, Inc.*, 68 F.Supp. 13 (S.D.N.Y. 1946) (author has no property right in his ideas unless they are embodied in tangible form; it is the means of expressing ideas, not the ideas themselves that warrant protection).

Plaintiff relies upon the case of *McGhan v. Ebersol*, 608 F.Supp. 277 (S.D.N.Y.1985) to support the contention that the legal relationship necessary to sustain a cause of action for misappropriation existed between the parties. Under *McGhan*, an idea is susceptible to a claim for misappropriation where the legal relationship between the parties is either a fiduciary relationship, or based on an express contract, an implied in fact contract or quasi-contract. *Id.* at 284 (citation omitted). "An implied in fact contract may be based upon industry custom or usage regarding submission and use of ideas." *Id.* at 285 (citing cases). A determination as to the existence of an implied agreement is made by the fact finder. *Id.*

The *McGhan* case is also instructive on the novelty element of the three-prong *Flemming* test:

> [I]n order to be protectable, adaptations of ideas must:
>
> > show genuine novelty and invention, and not merely clever or useful adaptation of existing knowledge ... [t]he judicious use of existing means or the mixture of known ingredients in somewhat different proportions—all the variations on a basic theme—partake more of the nature of elaboration and renovation than of innovation.

*Id.* at 286 (quoting *Educational Sales Programs, Inc. v. Dreyfus Corp.*, 65 Misc.2d 412, 317 N.Y.S.2d 840, 844 (Sup.Ct.N.Y.Co. 1970)).

The *McGhan* court further noted:

> Furthermore, a plaintiff may not claim that an idea is novel if the idea was already in use in the industry at the time of the plaintiff's submissions or if the defendant herself had already used that idea. *See Bram v. Dannon Milk Products*, 33 A.D.2d 1010, 307 N.Y.S.2d 571 (1st Dept.1970); *Downey v. General Foods Corp.*, 31 N.Y.2d 56, 334 N.Y.S.2d 874, 286 N.E.2d 257 (Ct.App.1972).

608 F.Supp. at 286.

Similarly, the court in *Silver v. Television City, Inc.*, 207 Pa.Super. 150, 215 A.2d 335 (Super.Ct.Pa.1965) noted that:

> It is no objection to claim of a person doing so, that he takes existing material from sources common to all writers and combines and arranges them so long as he creates a new form and gives them an application unknown before in a different manner and for a different purpose resulting in a real improvement over existing modes.

*Id.* 215 A.2d at 337. *Citing Stanley v. Columbia Broadcasting System*, 35 Cal.2d 653, 221 P.2d 73 (1950).

On the issue of novelty, the debtor relies on the case of *Downey v. General Foods Corp.*, 31 N.Y.2d 56, 334 N.Y.S.2d 874, 286 N.E.2d 257 (Ct.App.1972). In *Downey*, the plaintiff brought an action against General Foods Corporation to recover damages for the alleged misappropriation of an idea. The plaintiff claimed that he had submitted the name "wig-l-e", "wiggley" or a variation of that word, including "Mr. Wiggle" to the defendant for its new gelatin product, "Jell-O" and also suggested to the defendant that the product be directed toward the children's market. Plaintiff's idea was rejected by General Foods, which subsequently marketed the product under the name "Mr. Wiggle". The *Downey* court found that because the words "wiggle" or "wiggley" were "descriptive of the most obvious characteristic of Jell-O, with the prefix 'Mr.' added", and because the defendant had used the idea and a variation of the word "wiggle" years before the plaintiff submitted it, the plaintiff's idea lacked novelty and originality to sustain a cause of action for misappropriation. *Id.*, 334 N.Y.S.2d at 876–78, 286 N.E.2d at 259.

The *Downey* decision further supports the proposition that an idea is *not* original or novel if it is already in use in the industry at the time of the plaintiff's submission. *Id.* *See Bram v. Dannon Milk Products Inc.*, 33 A.D.2d 1010, 307 N.Y.S.2d 571 (1st Dept.1970) (the idea submitted by the plaintiff to the defendants, the concept of depicting an infant in a highchair eating and enjoying yogurt, was lacking in novelty and had been utilized by the defendants and their competitors prior to its submissions, resulted in a lack of

novelty fatal to a cause of action for its unlawful use); *McGhan*, 608 F.Supp. at 286. On the other hand, the fact that a plaintiff's idea embodies elements long in use does not necessarily preclude a finding of originality or novelty. *Baut v. Pethick Construction Company*, 262 F.Supp. 350, 361 (M.D.Pa.1966).

 The novelty and originality requirements must be viewed in the entire context in which the elements are used. *Baut v. Pethick*, 262 F.Supp. at 361. In examining Pennsylvania's common law right to an artistic production, the *Baut* court recognized:

" * * * The law has never considered it necessary for the establishment of property rights in intellectual or artistic productions that the entire ultimate product should be the work of a single creator; such rights may be acquired by one who perfects the original work or substantially adds to it in some manner. Thus, in *Wood v. Boosey*, 2 L.R.Q.B. 340, it was held that a person who arranged the score of an opera for the pianoforte thereby created an independent musical composition in which he had a right of property apart from that of the composer of the opera itself. In *Walter v. Lane* [1900] A.C. 539, it was held that one who reported for the Times a public address, together with a description of the meeting at which it was delivered, had property rights therein distinct from and additional to those of the speaker. The translation of a novel, or its dramatization, vests a distinct property right which is entitled to the same protection as is extended to the original. *Fleron v. Lackaye*, N.Y.Super. 14 N.Y.S. 292. A dramatic work, even though composed of selections from literary compositions which are public property, may possess such originality in its construction, or be so unique in its dramatic effect, as to be the proper subject of protected ownership. *Aronson v. Baker*, 43 N.J.Eq. 365, 371, 12 A. 177. * * * "

*Id.* The *Baut*, court recognized that, where the comparison of one product with another shows that a plaintiff's design is substantially copied, and that the differences are insignificant, a conclusion that a defendant appropriated a plaintiff's design is justifiable. *Id.* at 362.

Similarly, the court in *Flemming* emphasized that:

Although novelty has been considered significant ..., this element is more important for its evidentiary value than for substantive quality. [citations omitted]. In other words, where the issue is whether one's idea has in fact been used by another, similarities between the submissions and the ultimate product may justify the factual inference that one was copied from the other. *International Industries, Inc. v. Warren Petroleum Corp.*, 99 F.Supp. 907 (D.C.Del.1951), [*aff'd in part and rev'd on other grds* 248 F.2d 696 (3d Cir.1957)]. If the concept submitted is unique, or if there are many points of likeness, the inference is strengthened. On the other hand, a lack of novelty or the existence of many dissimilar features will support a denial that the idea was used by the recipient.

*Flemming*, 107 N.J.Super. at 317–18, 258 A.2d 153.

 This case clearly hinges on the question of whether the features of Mecklerstone's submissions which may also be found in Atlantis' "Treasures of Atlantis Sweepstakes" are so novel and original as to create the inference that Atlantis used or copied Mecklerstone's idea, within the meaning of the *Flemming* case. *See Id.* at 319, 258 A.2d 153. The court will first examine those features of the Mecklerstone submissions that Meckler himself contends he created for Atlantis and that he contends are thereby novel and original and were misappropriated by Atlantis, including:

(1) the name of the promotion [7] (*see* T1 at 70; *see also* T1 at 22, 29, 32, 48, 77, 105);

---

7. For purposes of clarity the court here notes that the name of the proposed Mecklerstone promotion was "The Treasure of Atlantis" (P–2); the name of the originally proposed CRC promotion was "Discover the Treasures of Atlantis" (D–10); and the name of the actual Atlantis

(2) the treasure map concept designed to move patrons of the casino around the building (T1 at 69–70; *see also* T1 at 22, 30, 33, 47–48, 54, 105, 140–41);

(3) the "treasure drum" concept designed to move patrons of the casino around the building (T1 at 71);

(4) the process of matching a number on a game card with a number on various displays throughout the casino (T1 at 73–74).

In support of its position with respect to the misappropriation of the promotion's name, Mecklerstone apparently relies chiefly on Proposal 1 which, as stated above, provides in relevant part:

The first thing we'd like to address is the name of the promotion. While "Find Your Slot" is catchy it's also very generic. You would be better off with a name that lends itself to your property ... a name that captures the essence of your operation (and of the casino experience in general) ... a name like ...

## THE TREASURE OF ATLANTIS

(P–2). Meckler stated at trial that it was Mecklerstone's idea to change the name of the "Find Your Slots" promotion to "The Treasure of Atlantis" because it fit in more appropriately with the whole theme of the Atlantis (T1 at 22). Meckler believed that "Find Your Slot" was a name that could be used by any casino, or in any business (T1 at 22). According to Meckler, he was familiar with the legend of The Lost City of Atlantis and in fact named the promotion with the legend in mind in order to tie the legend's theme to the casino's name and promotion (T1 at 77). Meckler also claims that while the use of the name "treasures" may be common in connection with game promotions and prizes, taking the legend of Atlantis and creating a game based on it for the debtor, Atlantis, was not common (T1 at 105–06).

In addition, Meckler testified that (1) no other names were discussed in connection with Proposal 1 (T1 at 48); (2) he was not aware that Atlantis considered other names for their promotion (T1 at 48); (3) the name "Treasures of Atlantis" was not discussed at the First Meeting (T1 at 78); (4) the parties did not discuss the name Atlantis and its relation to the legend of Atlantis prior to Proposal 1, nor at any other time (T1 at 79); (5) he never heard representatives of Atlantis mention the word "treasure" (T1 at 107).

The Atlantis rejects allegations that the name "Treasures of Atlantis Sweepstakes" was in any way developed as a result of Mecklerstone's ideas. Atlantis asserts instead that Atlantis' use of the name Treasures of Atlantis in October 1984 predates Mecklerstone's involvement with the casino beginning in November 1984 (T2 at 36–37). At trial, a color photograph of a sample poster, which poster is located in each of the hotel's elevators, was introduced (D–9).[8] The top of the poster reads in large script, "The Treasures of Atlantis at Your Fingertips!" (D–9). The poster depicts one scene from each of Atlantis' three casinos (T2 at 37); the name of the casino (either Salon, Shangri–La or Riverboat) appears to the right of each picture within the poster (D–9). According to McHugh, the photographs depicted in the poster of the various casino levels were taken in July 1984 and the poster itself was put on display in Atlantis elevators in October 1984 (T2 at 37). Ms. McHugh recalls when the photographs that appear reprinted in the poster were taken because she is in one of the pictures standing at a craps table (T2 at 37).

McHugh testified that the Atlantis contracted with the outside agency of CRC Advertising, which developed the "Treasures of Atlantis Sweepstakes," including its name (T2 at 50). McHugh explained that CRC had access to Atlantis' entire image campaign (T2 at 50), which was developed in view of the casino's name change from the Playboy Hotel & Casino to Atlantis in June 1984 (*see* D–8). McHugh

promotion was "Treasures of Atlantis Sweepstakes" (D–3; P–5).

8. Exhibit D–9 was entered into evidence based upon Mary Jane McHugh's affidavit dated and filed May 2, 1988.

further explained that Atlantis provided CRC with several names for the promotion, including "Discover Atlantis", "Treasure of Atlantis" and "Fortunes of Atlantis", and CRC in turn came up with their own concept and ideas (T2 at 50). One of the preliminary CRC proposals for a promotion was entitled "Discover the Treasures of Atlantis" (T2 at 50) (D–10). McHugh testified that after CRC had printed the aforementioned maps for Atlantis (P–6) CRC knew that the Atlantis was looking for a promotion to extend the life of the map and submitted the "Discover the Treasures of Atlantis", as well as two other versions of it (T2 at 50). McHugh added that the Mecklerstone submissions were returned to them in February 1985 (T2 at 47) and that none of the Mecklerstone materials played a part in the CRC proposals (T2 at 49).

On cross-examination, McHugh claimed that the words "treasure" and "Atlantis" were used together in at least two other proposals made to Atlantis (T3 at 23–24). McHugh also stated that Meckler's proposal's name (i.e., The Treasure of Atlantis) had been proposed by others and that Atlantis' chief concern was with the feasibility and workability of a promotion, rather than with the name of a promotion (T3 at 45). Nevertheless, McHugh acknowledged that the name "Treasures of Atlantis" and "treasure maps" did *not* appear on either (1) an Atlantis press release published on June 5, 1984, which announced the new name and new symbol for the former Playboy Hotel & Casino (D–8); or (2) an Atlantis interoffice memo dated September 27, 1984 (D–6) from Johnann McIlwain to Christopher Gibbons which listed an "edited compilation of suggestions from both advertising agencies and marketing staff" for possible casino statements or slogans (T3 at 31–32). McHugh testified that the name "Treasures of Atlantis" was suggested to Atlantis by its advertising agency at that time, but that Atlantis decided to pursue the "Discover Atlantis" concept (T2 at 30).

Because the court finds McHugh's testimony persuasive, Mecklerstone's allegations with respect to the misappropriation of the name "Treasures of Atlantis" must

fail. Assuming *arguendo* that Atlantis did obtain the name "Treasures of Atlantis Sweepstakes" from Mecklerstone, the name clearly lacks novelty in light of "The Treasures of Atlantis at Your Fingertips" posters (which predate the parties' First Meeting); the existence of the legend of Atlantis, which includes the concept of treasures of Atlantis; and the use of the concept of "treasures" in the industry in connection with other game promotions and prizes. At trial, Atlantis introduced portions of the book "*Atlantis, the Eighth Continent*" published by G.P. Putnam's Sons, New York, and copyrighted by Charles Berlitz in 1984, which discussed the name, legend and treasures of the lost continent of Atlantis (D–7). Standing alone, Proposal 1 seems to introduce a new name and a new concept for a game promotion. Analyzed in the context of the entire record however, the Treasures of Atlantis Sweepstakes is clearly " '[t]he judicious use of existing means or the mixture of known ingredients in somewhat different proportions—all variations on a basic theme ...' " and is thereby " 'more of the nature of elaboration and renovation than of innovation.' " *McGhan*, 608 F.Supp. at 286 (quoting *Educational Sales Programs, Inc. v. Dreyfus Corp.*, 65 Misc.2d 412, 317 N.Y. S.2d 840).

■ As to the treasure map concept, embodied in Proposal 1, Jeffrey Meckler stated:

> The treasure map was the whole promotion, the treasure map was the key component, the thing that did what our client wanted us to do, which was to basically get the people to know the casino, to get them up on the other floors of the casino.

(T1 at 22–23). Meckler pointed out that the key difference between the Find Your Slot Outline (P–1) and Mecklerstone's proposals was the map aspect (T1 at 30). According to Meckler, the treasure map took patrons from place to place in the casino and was the basis for the "Treasure of Atlantis" concept, which encompassed treasure maps, treasure chests, and mermaids (T1 at 140–41). According to Meckler, the use of

a map or diagram was not discussed at the First Meeting (T1 at 47) and that in fact the first time Meckler discussed the treasure map concept with representatives of Atlantis was at the December 7, 1984 meeting when Meckler presented Proposal 1, as contained in the December 6, 1984 letter to Christopher Gibbons (T1 at 122; P–2). In Meckler's opinion, the Discover Atlantis Brochure (P–6) and the Treasures of Atlantis Sweepstakes promotional piece (P–5; D–3), were produced to execute Mecklerstone's treasure map concept to get people to the second, third and fourth floors of the multilevel casino (T1 at 144).

Meckler testified that at one point he provided Atlantis with sketches of a treasure map, but that they were either lost or removed from his office as the result of a robbery in the spring of 1986. (T1 at 55; T1 at 130–131). Meckler further explained that while he assumed that the Atlantis paid another company for the Treasures of Atlantis Sweepstakes promotion (i.e., D–3, P–5 and P–6), he was unaware that the Discover Atlantis Brochure (P–6) was distributed well in advance of the actual promotion's start. (T1 at 132–33).

McHugh, on the other hand, testified that in May 1984, prior to the First Meeting with Mecklerstone and Webcraft, Atlantis was considering the use of a map and diagram (T2 at 21). According to McHugh, she had an in-house artist, Lou Fuano, already designing a diagram of the building at that time to be used for bus patrons and hotel guests (T2 at 21). Five sketches of a facility map were admitted into evidence as attachments to an Atlantis interoffice correspondence dated May 7, 1984 from McHugh to Tom Stanley the then vice president of marketing (D–5). As depicted in the office memo, the "map/diagram[s]" are "very basic and contain little detail, in an attempt to simplify and emphasize the location of gaming; public space and the skywalk in relation to one another." (D–5). These preliminary sketches, according to McHugh, were given to CRC and the Discover Atlantis Brochure was thereafter developed by CRC and publically distributed between May 1985 and January 1986 (T2 at 23). McHugh further testified that the concept of a map was developed by Atlantis as early as February 1984 (T3 at 48).

McHugh testified that the Discover Atlantis Brochures (P–2) were initially distributed for the sole purpose of guiding people around the building (T2 at 47; T3 at 34). When Atlantis later found the maps to be very expensive (i.e., $1.00 per map) however, Atlantis decided to create a promotion which would give patrons a reason to return their maps so that the hotel could reuse them (T2 at 47–48). As a result, Atlantis engaged CRC which tied the Discover Atlantis Brochure to the Treasures of Atlantis Sweepstakes (T2 at 48–49).

As stated previously, it is Atlantis' position that the Discover Atlantis Brochure (P–6) was used by the casino in May 1985, a full four months before the Treasures of Atlantis Sweepstakes began. According to McHugh, CRC was retained first to do a map of the casino which was completed and circulating publically by May 1985, and that they were at that time, after the Brochure was done, hired to develop a promotion which utilized the map with the intention that patrons learn the layout of the Atlantis facility and ultimately begin to use it (T3 at 10). According to McHugh, after CRC printed the maps and knew Atlantis was looking for a promotion to extend the life of the maps in or about June 1985, CRC submitted the "Discover the Treasures of Atlantis" proposal (D–10) (T2 at 50; T3 at 9–11). McHugh observed, while D–10 was not CRC's final proposal, it was the same as the final "Treasures of Atlantis Sweepstakes" except that the time tables were different and the actual promotion did not involve color coding entry forms (T2 at 51). CRC's "Discover the Treasures of Atlantis" proposal provided as follows:

OBJECTIVE

To motivate slot players to use upper level casinos.

STRATEGY

The chance of winning daily prizes and being automatically entered into a sweepstakes with valuable grand prizes will stimulate slot players to visit each casino level. More importantly, it will increase

the frequency of visitation during the life of the promotion. It will also increase local patronage.

## HOW IT WORKS

Numbered maps are distributed to general public and bus customers along with official rules and three-part entry form. Each entry form is color coded and corresponds to a color from each of the three casino levels shown on the map.

Customers will fill out individual entry forms and deposit them by color code at a specific location adjacent to each individual casino level.

The main sweepstakes display, grand prize drum and daily tote board will be located in an area to be named at a later date.

Daily drawings would take place every other hour beginning at 1PM with the final drawing taking place at 9PM. Fifteen minutes prior to the designated drawing time, entry forms will be drawn from the three casino levels and the numbers taken to the main display area for posting.

Customers will have one hour to claim their prize by matching their map number with the numbers posted on the tote board. Winners must be present to win and have their map in their possession.

Tote board will be wiped clean after every claim period and claimed daily winner forms will be deposited into the grand prize drum. After the last daily drawing, all entry forms will be placed into three grand prize drums, one representing each of the three casino levels.

The contest allows for a potential of nine winners per hour for a total of forty five potential winners per day, seven days a week. The contest period will be from Sunday July 7th through Monday September 2nd which is a period of 58 days.

## ENTRY FORMS

Entry forms will be color coded as earlier suggested with fill in area for name, address, map number and blank taken from casino level posters. Overlays for entry forms will be cut so that numbered posters and fill in words can be changed.

This will help control the flow of traffic through the different casino levels.

## COLLATERAL MATERIALS

Signage throughout property promoting the contest.

Signage at staging area and for each of the three deposit areas adjacent to the casino floor.

Signage for windows on boardwalk.

Extensions for existing guideposts for maximum contest promotion.

Duratrans for lightboxes.

Newspaper ads.

Radio commercials.

Employee buttons.

*Jitney posters.

*Bus posters.

*Billboards.

*Preprinted inserts.

*If budget warrants expenditure.

(D–10).

McHugh testified further that Atlantis "constantly" ran new game promotions and that prior to November 1984, Atlantis ran several promotions utilizing the concepts of card games and daily drawings which resulted in prizes, grand prizes, sweepstakes and drums (T2 at 52–53). In McHugh's experience, other casinos also constantly ran game promotions (T2 at 52). McHugh testified that the treasures or treasure hunt concepts have been used by other casinos, including the Claridge Casino and Tropicana Casino (T2 at 53; T3 at 39). McHugh testified that Claridge's promotion using a treasure hunt theme was used in 1985 (T3 at 39). McHugh admitted, however, that to her knowledge the concept of using a treasure map to take patrons from place to place in a casino was not in use by any casino at the time that Mecklerstone developed its promotion for Atlantis (T3 at 46). McHugh noted that she did not find it odd that CRC and Meckler both came up with promotions that involved a "map" and a "game card" because Atlantis representatives told Meckler when he first met with them that they wanted a promotion that moved patrons throughout the property and that they were desirous of using a diagram of the building (T3 at 48–50).

The record clearly illustrates that Atlantis was using a map created by CRC a full four months before the Treasures of Atlantis Sweepstakes began and that CRC made certain specific proposals to Atlantis involving the map's use in conjunction with a game (D–10). Accordingly, the court again finds that the record supports McHugh's testimony that CRC developed the map in conjunction with a game in response to Atlantis' need to educate patrons regarding their facility and to extend the life of the maps at the same time.

Moreover, while it is true that both Mecklerstone's proposal and Atlantis' actual promotion employed a map plus a "game card", comparison of the function of the maps (i.e., the Entry Form (P–5; D–3) and the Discover Atlantis Brochure (P–6), with Proposal 1 (*see* P–2) and Proposal 2 (*see* P–3)) within the context of the parties' respective promotions, minimizes the maps' similarities. For example, Atlantis' Entry Form (P–5; D–3) was not a "game card" in that it was not actually employed by patrons while playing the Treasures of Atlantis Sweepstakes. Rather, the Entry Form merely had to be filled out by players and placed in one of three treasure drums in order to be eligible for the various Sweepstakes drawings (T3 at 51). The only reason the Discover Atlantis Brochure was needed to play the Sweepstakes was so that the Brochure's map number could be inserted in the blank spaces on the Entry Form (*see* T3 at 66). According to McHugh, some patrons randomly selected numbers and inserted them on the Entry Form without having obtained a Brochure (T3 at 53). Mecklerstone's promotion envisioned the use of special maps that would direct players to various "treasure zones" throughout the casino and there was a map for each treasure zone (T1 at 54; T3 at 50). Mecklerstone's promotion involved a game card with 15 square configurations whereby players matched the mermaids on 12 to 15 display units throughout the casino with three mermaids inkjetted in three squares on the game card (*See* Proposal 2 (P–3) at ¶ 7; T3 at 51). This "treasure map" would be used by patrons to locate the proposed display units (*See* Proposal 1 (P–2) at ¶ 4).

The game card and the map were part of the same piece, although detachable (*See* Proposal 1 (P–2) at ¶ 5). In short, Mecklerstone's maps were a fundamental aspect of its proposed game because the maps were necessary to locate the "treasure zones" and monitors and ultimately match the items from the game card with the items on the monitors or displays. Atlantis' Brochure and Entry Form, on the other hand, were necessary to enter the Sweepstakes but played no role in the Sweepstakes itself. The Brochure map was merely a diagram of the casino; the Entry Form map was a diagram of the casino which identified where forms were to be deposited and prizes to be picked up; the Sweepstakes was a drawing which, unlike Mecklerstone's proposals, did not involve patron interaction with the casino floor.

Given the nature of Atlantis' traffic flow problem, this court does not find the treasure map concept so unique as to preclude a finding that CRC independently developed the idea. While Mecklerstone's Proposal 1 and Proposal 2, involving holigraphic mermaids, treasure chests, treasure zones and especially display monitors throughout the casinos are indeed unique when considered as a whole, the utilization of the treasure map concept alone does not qualify as novel and unique. "A plaintiff cannot recover for misappropriation of ideas unless the ideas are actually used." *McGhan*, 608 F.Supp. at 286 (citing cases).

Certain dissimilarities between the actual Atlantis promotion and the Mecklerstone proposals are obvious. For example, Atlantis' promotion featured a "Treasure Island" Promotions Area and did not require patrons to remain in a particular "treasure zone" in order to be eligible for a prize (*See* P–6). While drawings in the Atlantis Sweepstakes were held at two hour intervals, Mecklerstone proposed a twenty minute period for players to claim their prize. Atlantis Sweepstakes' winners were eligible for various prizes including an automobile, a cruise, a mink coat, a tour of Rome, Florence and Naples, Italy or a riverboat tour on the Mississippi River (*See* P–5, D–3 Side 1) whereas winners of Mecklerstone's

proposed game received prizes of varying value and became eligible for a grand prize of a "treasure chest" filled with gold and jewels, with a suggested retail value of $25,000.00 to $50,000.00 (*See* P-1). Most obviously, the distinguishing features of the Mecklerstone game—a mermaid mascot and the use of a holographic display of a mermaid in the casino's lobby and the matching of symbols on a card with symbols on a slot machine or later a display unit—were not employed in the Atlantis promotion. An idea lacks novelty where it has been "utilized by the defendants and their competitors prior to its submission" and "lack of novelty in an idea is fatal to any cause of action for its unlawful use." *Bram*, 307 N.Y.S.2d at 571. The court again finds Atlantis' use of the treasure map concept to be, at best, " '[t]he judicious use of existing means or the mixture of known ingredients in somewhat different proportions—all the variations on a basic theme....' " *McGhan*, 608 F.Supp. at 286 (citations omitted). In short, the dissimilarities between the Mecklerstone submissions and Atlantis' ultimate product do *not* justify the factual inference that one was copied from the other within the meaning of the *Flemming v. Ronson* case. *See* 107 N.J.Super. at 317–18, 258 A.2d 153.[9]

Mecklerstone argues that an implied-in-fact agreement was formed between itself and the Atlantis. Plaintiff relies upon the cases of *McGhan*, 608 F.Supp. at 285 (an implied-in-fact agreement may be based upon industry custom regarding the submission and use of ideas) and *Whitfield v. Lear*, 751 F.2d 90 (2d Cir.1984) (where an offeree accepts a submitted idea with full knowledge that the offeror expects payment in the event that the idea is used, liability under an implied-in-fact agreement may be found) to support its position. The essence of an implied-in-fact agreement un-

der New Jersey law however is mutual agreement and an intent to promise. *Kozlowski v. Kozlowski*, 164 N.J.Super. 162, 395 A.2d 913 (1978), *aff'd and remanded* 80 N.J. 378, 403 A.2d 902 (1979). "It is elementary that the assertion of a contract implied in fact calls for the establishment of a consensual understanding as to compensation or reimbursement inferable from the circumstances under which one furnishes services or property and another accepts such advances." *Deskovick v. Porzio*, 78 N.J.Super. 82, 86–87, 187 A.2d 610 (App. Div.1963). In this case the parties agreed that Mecklerstone would submit a proposal for a promotion to Atlantis; whether the business relationship between the parties was initiated by Mecklerstone or Atlantis is immaterial. Thus, a consensual understanding that Mecklerstone would be compensated for its ideas, if used, could be implied from the parties' actions. The court does not refute the plaintiff's position that it is customary in the advertising and public relations industries that agencies such as Mecklerstone are compensated for the use of ideas submitted and used. The problem with Mecklerstone's argument, however, is that the record does not support its contention that its ideas were actually used by Atlantis. The record merely establishes that Atlantis agreed to consider Mecklerstone's ideas and that the parties embarked upon a course of negotiation looking toward an agreement which never materialized. The facts that (1) Atlantis received other submissions for the promotion at issue, and (2) Atlantis expressly rejected Mecklerstone's promotion and returned its submissions, support this finding. Hence, the court rejects the plaintiff's argument that an implied-in-fact agreement was formed between the parties.

For the reasons set forth above, the debtors' motion is granted and the plaintiff's

---

**9.** Having found that the Mecklerstone promotion was substantially dissimilar to the Atlantis promotion, the Court does not address the argument raised by debtor's counsel that certain of the ideas contained in the Mecklerstone proposals, particularly the use of game cards with

basic slot symbols which were also contained on display monitors were part of an earlier proposal developed by Mecklerstone in early 1984 for the Tropicana and Sands Casino Hotel prior to Mecklerstone's dealings with Atlantis

claim in the amount of $115,200.00 [10] is hereby expunged in its entirety.

An order shall be submitted in accordance with this opinion.

(T1 at 98, 100–101). (*See* Post–Trial Memorandum of ESA at p. 2).

**10.** As noted above, plaintiff's proof of claim was originally filed in the amount of $115,200.00 and reduced thereafter at trial to $100,000.00, to delete a claim for punitive damages (T1 at 42–43). The court here notes that the question of damages was addressed by the parties at trial and in their briefs. Because the court has found that Mecklerstone's claim fails, however, it has declined to develop the damages issue to any extent herein.